DEC 27 2022 PM2:42
FILED-USDC-CT-New Haven

# EXHIBIT A



RETURN DATE: AUGUST 9, 2022     :     SUPERIOR COURT

CHRISTOPHER AMBROSE     :     JUDICIAL DISTRICT OF NEW
    HAVEN AT NEW HAVEN

v.     :

FRANK PARLATO, JR.     :     JULY 12, 2022

## COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

### PARTIES

Christopher Ambrose, who resides at 381 Horsepond Rd., Madison, CT ("Plaintiff"), hereby alleges the following, on information and belief, against Frank Parlato, Jr., who resides at 29009 Geranium Dr., Big Pine Key, FL ("Parlato"):

### SUMMARY OF ACTION

Beginning on October 3, 2021 and continuing through the present, Parlato has maliciously published on the Internet no fewer than 48 different "articles" that contain demonstrated falsehoods about every aspect of Plaintiff's character, history and beliefs and accuse him of crimes of moral turpitude. The cascade of lies Parlato published includes, but is not limited to, stating that Plaintiff: is a pedophile; sexually molests his children; emotionally and physically abuses his children; admits to watching child pornography; produces pornography; had multiple, multi-year extramarital affairs, including a gay lover; has stolen over $1 million from his spouse; is a "deadbeat" who did not financially support his estranged wife once he filed for divorce; has bribed and/or colluded with the guardian ad litem, custody evaluator, judges and his spouse's own attorneys to wrongfully gain custody of their children and keep her from seeing them; is an active participant in a vast, RICO conspiracy involving the Connecticut family court judiciary and bar as well as law enforcement, child protective services, elected and appointed public officials; is psychologically unstable; has a drinking problem and anger issues; and is an inveterate liar who makes frequent threats.

Parlato published - and continues to publish (most recently on July 8, 2022) - his libelous articles on two blogs he controls, *TheFrankReport.com* and *artvoice.com*. To inflict as much damage as possible, Parlato has re-published virtually all of his articles in full on a website that *specifically targets Connecticut*, *familycourtcircus.com*, a virulently anti-Semitic and racist site which has published 150 other defamatory articles against Plaintiff and nearly everyone else associated with his divorce case. To expand his audience further still, Parlato re-published elsewhere on the Internet, including on *6park.news/connecticut,* another site targeting Connecticut, dailyadvent.com and spotonnewyork.com. Parlato has also created Twitter and Instagram accounts, both of which are exclusively dedicated to publicizing his attacks on Plaintiff.



On information and belief, Parlato is aware that virtually everything he has published about Plaintiff has been investigated by public authorities, litigated in court and found by final judicial decision to be baseless, as is reflected in multiple published judicial decisions.

Through his widely published, libelous articles Parlato has invaded Plaintiff's privacy by false light, defamed him and intentionally inflicted extreme emotional trauma and catastrophic financial harm on him.

Parlato has never met or even communicated with Plaintiff or his children, though he falsely claims to have done so. It is unclear why Parlato has embarked on this relentless, many months long mission to destroy someone he does not know. What is clear is that Parlato's false narratives parrot the false allegations Karen Riordan Ambrose ("Riordan") began making after Plaintiff filed for divorce from her in July 2019. Seeking a peaceful end to the union, Plaintiff asked for shared custody of the three children, then 13, 13 and 10, and offered a 50/50 split of their financial assets, though he had been the sole provider throughout the entirety of the marriage. (Even during the three years before the couple had children, Riordan was never employed, except to tutor one middle school student). Riordan never responded to this offer; instead, she began a vicious, one-sided campaign of slanderous and libelous allegations intended not only to prevent Plaintiff from getting custody and destroy his relationship with the children, but to send him to prison for the most heinous crimes.

Parlato boasts that he considers himself to be an "investigative journalist," but his articles make apparent that he does not even check basic facts, let alone do the rigorous corroboration that the profession demands. Parlato has published his false narratives by lazily relying on a single source, Riordan. He is well aware that Riordan is extremely truth-challenged, evidenced by multiple contempt orders for perjury and spoliation of evidence. He also knows that her erratic, often unlawful behavior so concerned multiple judges and the many mental health professionals involved in the divorce case that they determined Plaintiff should have sole legal and physical custody of the three minor children. It is incomprehensible that a "journalist" would rely on the word of a such deeply troubled individual, who has a documented history of perjury - and an ax to grind to boot. It is unconscionable that he has embarked on a scorched earth campaign of lies to destroy the reputation, emotional and financial life of someone he does not know and inflict severe emotional trauma on three innocent children.

It is worth noting the recent, widely reported *Depp v. Heard* defamation case, in which Heard, in a single op/ed made a single defamatory allegation of abuse against Depp, who she never mentioned by name. The court recognized that even one false allegation caused significant damage to Depp's reputation. By contrast, Parlato has made dozens of false statements against Plaintiff, including allegations of the most hideous, morally repugnant crimes, in over 48 (and counting) lengthy articles with salacious headlines containing Plaintiff's name, all of which he published on multiple Internet venues and flogged on still more media platforms in order to expand his audience and so exacerbate the harm he inflicted on Plaintiff. The intensity Parlato employs in his efforts to invade Plaintiff's privacy by false light, defame him and intentionally

inflict emotional distress is as strange as it is cruel. If the *Depp* case shows that one false allegation brings significant damage to someone's life, the damage Parlato's relentless, vicious lies reeks on Plaintiff's is nothing short of catastrophic.

It is also important to note that Plaintiff has never publicly responded to Parlato's published articles nor has he even uttered a public word against Parlato or for that matter against his "source," Riordan. Plaintiff has remained silent because his three children and their best interests are his primary focus. He will not risk further traumatizing them the way Parlato and their mother do so constantly with their hateful, very public campaign, in which they use the children by exposing the most sensitive, confidential details about them in pursuit of malignant purposes.

That Parlato is acting with knowing disregard for the truth - malice - not only makes his conduct more egregious, it makes him dangerous. The law does not tolerate such malicious, life-altering acts. Plaintiff brings this complaint to vindicate this principle and to right the contemptible wrongs Parlato has committed and continues to commit against Plaintiff.

## JURISDICTION

Though Parlato is a non resident individual, Connecticut has personal jurisdiction over him. Connecticut courts have generally held that a communication whose content may be considered tortious that is sent into Connecticut from out of state constitutes a "tortious act within the state" for purposes of Connecticut's long arm statutes. See, e.g. *Knipple v. Viking Comm., Ltd.*, 236 Conn. 602, 610 (1996) ("False representations entering Connecticut by wire or mail constitute tortious conduct in Connecticut under § 33-411(c)(4)"); *Doe v. Oliver,* No. CV990151679S, 2003 WL 21235402, at *2 (Conn. Super. May 19, 2003) (citing cases). Accordingly, the hundreds of falsehoods published by Parlato in over 48 articles and sent into Connecticut over the Internet on multiple venues, including those that target the state, constitute tortious conduct in the state, and, as such, provide a basis for personal jurisdiction.

Moreover, Parlato has sufficient contacts with Connecticut to satisfy any due process concerns. "[S]o long as it creates a substantial connection with the forum state, even a single act can support jurisdiction." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n. 18 (1985) In *Cody v. Ward,* 954 F.Supp. 43 (D.Conn. 1997), the district court found that a series of emails and phone calls made by a defendant to Connecticut were, in light of the nature of the communications, sufficiently substantial contacts so as to satisfy jurisdictional due process requirements. Id. at 47. Similarly, the superior court in *Oliver* found that due process requirements where satisfied where a foreign defendant allegedly purposefully sent an email into Connecticut to "get even" with a plaintiff. See also *Margolis v. Gillam,* (Conn. Super. Feb. 22, 1995) (citing cases in which even a single defamatory communication was sufficient to comply with due process requirements).

Likewise, Parlato published dozens of articles about Plaintiff and sent them into Connecticut on multiple websites, including those that clearly target the state. These articles sent to Connecticut,

in light of the nature of the communications, are sufficient contacts to satisfy due process standards, and it would not be unreasonable for the court to exercise jurisdiction over Parlato.

## FACTUAL ALLEGATIONS

1. For years, Parlato has misrepresented the truth or told outright lies about matters large and small. In 2015, after a four year joint investigation by the FBI and IRS, the US Attorney for the Western District of NY (Buffalo) brought an 18-count indictment against Parlato, many of the counts involve fraud. He was arrested and taken into custody.

2. The US Attorney considered Parlato's character to be such that the Government immediately demanded his passport and requested federal probation officers monitor his conduct and movements. The judge shared these concerns and granted the demands.

3. Parlato was permitted by federal authorities to relocate to a small house in the Florida Keys, though he remains under federal supervision. There, in December 2021, Parlato was again arrested, this time for battery, false imprisonment and witness tampering as well as probation violations. The US Attorney requested that he be remanded to custody, but acceded to the judge's mandate of an anger management evaluation and counseling.

4. After literally years of delays created by Parlato's repeated motions for continuances and adjournments, the jury selection for the federal trial against him is scheduled to begin on September 13, 2022. He is facing 20 years in prison.

5. One would think that someone with such a tenuous hold of his freedom would be on his best behavior. But on October 3, 2021 Parlato published a lengthy article on-line in *The Frank Report* and then re-published again on *The Family Court Circus* and other blogs. The article was filled with lies, including allegations of morally repugnant crimes, that were maliciously intended to invade Plaintiff's privacy by false light, destroy his reputation and cause him great harm. Like the 47 after it, the article contained the same lies and false accusations that Riordan had been making since shortly after Plaintiff filed for divorce in July 2019. As stated, Parlato has never met or even spoken to Plaintiff.

6. Parlato's articles are often accompanied by private photos of the couple's children and even by their confidential psychological, medical and DCF records, all of which could only have been provided by their mother, Riordan, who even provided audio recordings that she had ordered her daughter to secretly make of private sessions with her therapist. In a spectacular invasion of privacy, Parlato published all of this confidential information - many times - on multiple websites, where it will remain indelibly on the Internet, available to the world in perpetuity. This conduct, which is indisputable, offers a sense Parlato's character: for his own selfish interest, he will visit emotional trauma on innocent children.

7. At the time Parlato posted his first article, numerous public records, including court orders, uncontested courtroom testimony, police reports and financial records, were available for his review. These publicly accessible documents definitively disprove virtually every one of the false allegations he published.

8. That Parlato, a self-described "investigative journalist," did not check readily available facts before publishing such obviously defamatory narratives manifests his malicious intent to bring harm to Plaintiff. If Parlato now asserts that he did due diligence, then by knowingly

publishing falsehoods he exhibits frightening and intentional disregard for the truth. Either way, his actions constitute malice.

9. How/when Paralto and Riordan became acquainted is unclear. To Plaintiff's knowledge, the two did not know each other prior to July 2019. Plaintiff had never heard Parlato's name before October 3, 2021 when he published the first libelous article.

10. The nature of Parlato's relationship with Riordan is also unclear. Authorities confirm that in January 2022, Riordan traveled to Buffalo, where Parlato lived when he was indicted and is believed to have been visiting family at the time. To Plaintiff's knowledge Riordan had never before been to Buffalo nor does she know anyone there. On information and belief, sometime in the winter of 2022, Riordan relocated to Florida, where she moved into Parlato's modest bungalow. While it is confirmed that Riordan was living in Florida through June 2022, it is unclear whether she currently resides there. Whatever the nature of the relationship, Parlato has spent considerable time and effort publishing and publicizing Riordan's false narrative about Plaintiff, who Riordan has spent three years seeking vengeance against, but Parlato has never met.

11. Riordan began telling falsehoods about Plaintiff immediately after he filed for divorce. First, she slandered him to family, friends and neighbors - then to the custody evaluator and guardian ad litem. When her spoken lies didn't get the traction she sought, she began libeling Plaintiff, initially in emails then, beginning in December 2020, she caused to be published the first of 150 (and counting) defamatory articles on *familycourtcircus.com.*, a virulently anti-Semitic, racist, homophobic website that attacks the Connecticut family courts. <u>This is the same website where Parlato has republished in full nearly all of his articles against Plaintiff.</u> It is important to note that Parlato does not re-publish his articles about other subjects/individuals on Connecticut-specific sites; so his re-publications are clearly intended to inflict the most damage possible on Plaintiff by "hitting him where he lives."

12. At the couple's contentious divorce trial, which began in Superior Court in Middletown in March 2021 and finally concluded in March 2022 (the "Trial"), Riordan adamantly denied - many times, under oath - that she had anything to do with *Family Court Circus* or Paul Boyne, who has been identified by the FBI, the CT and VA State Police to be its publisher. But her phone records were subpoenaed and revealed that her denials were lies. Riordan had been in almost daily contact with Boyne; in just one ten-week (January 1, 2021 - March 16, 2021), they communicated no fewer than 147 times. On information and belief, Riordan continues through the present day to work with Boyne to defame Plaintiff on the blog, where Parlato republishes his falsehoods.

13. After the lengthy Trial concluded at the end of March 2022, Plaintiff sent Parlato a cease and desist letter via e-mail and the USPS on April 14, 2022 (the "Letter"). Plaintiff advised that Parlato's published falsehoods had destroyed his reputation and caused him extreme emotional distress and financial harm. He requested that Parlato cease publishing the lies as well as the confidential information about his children, and that he publish a full retraction of the lies. The Letter offered Parlato reasonable time - ten (10) days - to correct the falsehoods; if he did not so comply, Plaintiff would be forced to pursue legal action and seek all relief to which he is entitled.

14. Parlato did not respond to the Letter; instead, he published *additional* libelous articles, all of which tediously repeated lies and false allegations. The headline of one of these article childishly taunted Plaintiff, "Sue Me." What is more upsetting still, Parlato published *more* confidential information about the children, including DCF and hospital records, which, again, could only have been provided by Riordan.

15. In most of the articles, Parlato falsely claims that the children despise or fear Plaintiff or Parlato falsely attributes to them derogatory statements about Plaintiff. Most of the articles also contain private photos of the children and many published confidential documents revealing highly sensitive information. The children realize their mother is the one enabling Parlato's massive violations of their privacy and that she is attributing to them the hateful comments/emotions/actions. The two older children have read Parlato's published articles, having seen them on *The Family Court Circus,* which they had been aware of for some time. Unfortunately, their peers have also seen these articles, which has subjected the children to intense public scrutiny, ridicule and humiliation and resulted in "child emotional trauma," the clinical diagnosis. The children also realize this information will be available on the Internet for the rest of their lives, to be read by future schoolmates, colleagues and employers. Parlato has permanently, utterly shattered *their* privacy and exposed *their* most confidential information at the most difficult time in their young lives. For Plaintiff, the suffering Parlato has knowingly caused the children is the most insidious result of this entire hateful campaign. However, Plaintiff is not litigating on behalf of the children here. His motivation is their best interests, which is to protect them from any further interaction with Parlato; in any capacity, in any forum. Therefore, other than Parlato's false allegations of abuse that have been thoroughly investigated by public authorities, litigated in court and definitively determined to be baseless by judicial decisions, this action will not address the many other statements that Parlato falsely attributes to the children about their father, even though his publication of those false statements is defamatory, constitutes a massive false light invasion of privacy and has caused emotional and financial harm.

16. The false allegations that Plaintiff plagiarized are among the most often and tediously repeated by Parlato. While there were erroneous reports in the media regarding this matter, Parlato put his own false twist on the story, publishing that Plaintiff "admitted" to the custody evaluator that he stole intellectual property and that he had been "immediately fired for being a plagiarist." Neither of these statements is true. No legal action was ever brought against him by any party and his agents did not "drop" him, which Parlato claims. Those lies have caused Plaintiff great distress, but, as with the children, Plaintiff wants to spare his professional colleagues from any interaction with Parlato. He does not want to cause them to have to spend the time (or money on attorneys, etc.) by pulling them into this tawdry mess. Therefore, no matter how significant, Plaintiff will not pursue damages for Parlato's false allegations regarding plagiarism here. There are many other malicious, false light invasions of his privacy, defamation and infliction of emotional distress by Parlato for which Plaintiff seeks justice.

17. Parlato's malicious destruction of Plaintiff's reputation, emotional and financial health has an even more craven aspect to it: commerce. It seems there can be no doubt that Parlato is

pursuing his aggressive, libelous campaign against Plaintiff in an effort to generate "clicks" and drive readers to his websites. As stated, Parlato labels himself an "investigative journalist" and boasts about his supposed credentials. He has set up his blogs to resemble legitimate, albeit tabloid, news sites. He then republishes his false narratives not only to reach a wider audience but to attract the specific audience that will be most responsive to his lies. He even created Twitter and Instagram accounts solely to advertise his false narratives against Plaintiff. Parlato also shamelessly uses tabloid-style, salacious headlines, "Pedophilia… Child Abuse…Child Porn…" designed to grab attention, even as he knows that the crimes these headlines allege have been investigated and definitively determined to be lies. More disturbing still, he publishes photos of the young children who are supposedly the victims of these crimes. In short, Parlato is exploiting Plaintiff and his children for his own commercial benefit. Parlato as much as admitted this in a text to Plaintiff's private cell on February 23, 2022, "Your story is catching on like wildfire… There's so much more to write." The "story" is the narrative that Parlato knows to be false yet continues to publish; that it is catching on like "wild fire" indicates that he monitors the attention his stories generate and responds, as he was doing with the call, trying to get Plaintiff to comment. All of this strongly suggests that Parlato is deriving "clicks," if not economic benefit from his exploitation. And with each re-publication on a different site, Parlato widens the audience, causing Plaintiff greater harm and bringing Parlato greater benefit.

18. The totality of these circumstances must be considered when assessing this Complaint. The fact that Parlato may occasionally append the word "alleged" to a vicious accusation does not cover that he is really making a specific statement of fact and hiding it as allegation or supposed statement of opinion. This is especially true since he nearly always omits material facts and so creates a deceptive context for those statements. Similarly, an opinion is privileged as fair comment "only when the facts on which it is based are truly stated or privileged or otherwise known either because the facts are of common knowledge or because, though perhaps unknown to a particular recipient of the communication, they are readily accessible to him." (Emphasis added.) Harper James, 3 Restatement (Second) Torts, p. 459. If the facts that are criticized or commented upon are not stated or known, however, then fair comment is no defense. An opinion must be based upon facts; if the facts are neither known nor stated, then a defamatory opinion implies that there are undisclosed defamatory facts which justify the opinion.

## FIRST CAUSE OF ACTION

### (Invasion of Privacy by False Light at Common Law and the Second Restatement of Torts)

1. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

2. Parlato has published at least 48 different articles that invade Plaintiff's privacy by false light. Within each article, Parlato tediously repeats - often many times - the same false statements, then repeats them again in subsequent articles, all of which are then often re-published in full on still other sites. In order to keep this Complaint from being unwieldy, not every instance of each false statement will be referenced; in fact, not even every article in

which the false statement is made will be referenced here. But it should be understood that *virtually every false statement constituting false light invasion of privacy identified herein is made more than once, not only within the same article, but in subsequent articles, which are then often re-published on multiple venues, which increases the number of people of who may see the statement and therefore increases the harm done to Plaintiff.*

**A. Parlato maliciously and falsely published that Plaintiff is a pedophile who sexually abused his own children.**

3. In *The Frank Report* on October 3, 2021, Parlato published, "The Multi Disciplinary Task Force at Yale New Haven Hospital [sic] on Jan. 26, 2021 found that the children made disclosures of sexual abuse by their father. At the Connecticut Children's Hospital, on Dec. 2, 2020, the children also made disturbing disclosures… Sawyer told Connecticut Children's Hospital, 'dad has been sexually abusing me for the last 7 months'. New Haven Hospital [sic] said Sawyer, 'Reports that for 'months' dad has touched him inappropriately in his private parts…. Reports that last time he was touched inappropriately was one week ago.' Mia told Children's Hospital that, 'he touches my brother [Sawyer] and he really scares us. …[and] cuts us off [from seeing anyone.' New Haven Yale [sic] reports Mia, 'feels unsafe at home around dad, states dad fondling her breast' and reported 'youngest brother (10 yo) reported inappropriate touching (fondling penis)' by dad. Mia says dad 'tried to touch me' but 'I ran away'." In *The Frank Report* on October 12 Parlato published, "[Plaintiff] touched his son's penis, went into bed with him repeatedly, kissed him inappropriately… touched his daughter's private parts." On March 28, 2022, "[The children were removed] from their mother's primary custody and into the home of their abusive father [Plaintiff]."

4. Sexually abusing a child is a felony under CGS § 53-21.

5. At the time Paralto published, on information and belief, he had knowledge that all of these allegations had been thoroughly investigated by multiple public authorities, including police detectives from various police departments and the State Police, caseworkers and investigators from DCF in Fairfield, New Haven and Middlesex Counties and professionals at Yale New Haven and CT Children's Hospitals. *Every single allegation was determined to be baseless. Every single one.* Parlato <u>deliberately omitted this critically material fact to invade Plaintiff's privacy by putting him in a reputation-shattering, extremely damning false light.</u>

6. The results of the abuse investigations were also part of the publicly available Trial record. Four witnesses - a police detective, social worker, DCF investigator and DCF supervisor - provided <u>*uncontested testimony that the children indicated that Riordan had led them to accuse Plaintiff of abuse.*</u> Her coaching was confirmed by additional contemporaneous reports by professionals from DCF, Yale New Haven and Connecticut Children's Hospitals, who spoke with the children after different incidents. The children's statements are substantiated further still by text messages Riordan sent to the older son. During a court-ordered 90 day period when she was not to contact the children, Riordan acquired a burner

phone, ordered the boy to make accusations against Plaintiff, then demanded he delete her texts and never tell anyone - including his psychiatrist - what she had done. This was not a one-off moment of weakness, Riordan texted her orders relentlessly over several days because the boy wasn't complying with her demands. Again, on information and belief, Paralto was aware of these facts, which were all also in publicly available Trial testimony <u>long before he published</u>. Parlato never once stated that all the abuse allegations the children made were determined to have been coached by Riordan, which put Plaintiff in a damning false light.

7.  In order to lend credibility to his false narrative, Parlato referenced and even published many confidential documents, including medical, psychiatric, DCF and hospital records, billing statements, even the entire, court-sealed custody evaluation. As with the children's statements, Parlato published these records <u>omitting material facts</u> and so cast Plaintiff in a false light in order to destroy his privacy and his reputation. For instance, in *The Frank Report* on October 4, 2021 and April 26, 2022, Parlato published that the State determined that Plaintiff "is a high risk abuser" and included a photo of a Superior Court document identifying Plaintiff as such. However, as established at Trial, this document was based <u>solely</u> on information provided by Riordan, whose credibility was severely compromised after a string of perjury and spoliation of evidence contempt orders against her (and never reported by Parlato). Parlato also omitted the fact that multiple courts have specifically determined that Plaintiff is <u>not</u> an abuser, which is why he's had sole physical and legal custody of the children since April 2020.

8.  In short, in the dozens of articles he published on the Internet over the course of nine months (and counting), Paralto has "substantiated" the false allegations of abuse by using confidential documents and deceptively omitting the material fact that Plaintiff was exonerated of every single charge of abuse. This is evidence of Parlato's  malicious intent.

9.  Falsely accusing the someone of the most morally repugnant crime and misusing evidence to support that false accusation is an invasion of privacy by false light; it's hard to imagine an accusation that would more thoroughly destroy someone's reputation or bring greater emotional distress.

**B.  Parlato maliciously and falsely published that Plaintiff admitted to viewing child pornography and that he is attracted to children.**

10. In *The Frank Report* on October 3, 2021, Parlato published, "[In the] custody evaluation report [sic], [Plaintiff] admits to viewing what can only be described as gay Latino child porn… His true sexual desires, he admitted, are for anything but a woman. He prefers Latino 'Boiz'…" On October 6 Parlato published,"[Plaintiff] has a penchant for young Latino boys [the Ambrose children are Latino]." On October 12, "[Plaintiff] does not like women, only boys…" Also on that date, Parlato states that Plaintiff visited, "all kinds of sites with adults having sex with Latino boys." On February 28, 2022, "The children are adopted, and are Latino, and the father's porn proclivities tend toward young Latinos." On April 3, "[Plaintiff] enjoys porn featuring fathers who rape their Latino sons."

11. Possessing child pornography is a felony under CGS § 53a-196.

12. Plaintiff never "admitted" to viewing child porn to the custody evaluator or anyone else nor did he ever make claims about his "true sexual desires" or a preference for "Latino boys." He does not make these statements in the custody evaluation, as Parlato states, or anywhere else. Moreover, the evaluator was never even asked on direct or cross by any of Riordan's five attorneys about these allegations. These defamatory statements were maliciously fabricated by Parlato in an effort to invade Plaintiff's privacy by false light, and reveals far more about Parlato's malicious intent - and his own prurient fantasies - than about Plaintiff.

13. That Parlato repeatedly states that the supposed "kiddie porn" involves children who are Latino and that Plaintiff's children are Latino is clearly intended to put Plaintiff in the most damning false light by creating the impression that he adopted the children in order to molest them.

14. Parlato published that Plaintiff admitted to viewing child porn in a custody evaluation that was seen by many professionals, including mandated reporters and several judges. If Plaintiff had made such a confession, he would have been arrested for the felony. Yet Parlato ignored this common sensical reality check and maliciously and frequently published his false allegations against Plaintiff.

15. Parlato also published that Riordan had computer "evidence" showing Plaintiff was viewing child pornography. In *The Frank Report* on October 16, Parlato published, "[Plaintiff] wanted any investigation into child porn quashed and fast. It almost worked." It "almost worked" indicates that it did not work and there was an investigation which was not quashed. In fact, all supposed evidence of porn was investigated by the State Police and by private forensic experts. Not a single expert said there was evidence of child porn. This too was part of the publicly available Trial testimony, which Parlato knowingly disregards in his many publications.

16. Also on October 16 in *The Frank Report*, Parlato published that an anonymous forensic expert claimed that unnamed "cyber investigators" from unidentified "law enforcement agencies" are "continuing the investigation [of Plaintiff and child porn]." This story is accompanied by a very lengthy list of gay and child porn sites purportedly from Plaintiff's computer. It is now more than eight months later, Parlato has never published another word about this alleged "continuing investigation." On information and belief, this entire story is yet another complete, malicious fabrication by Parlato intended to invade Plaintiff's privacy by false light.

17. These false allegations of child porn were not only a malicious effort to send Plaintiff to prison, they were a calculated attempt to influence the court's decision regarding custody. Thankfully, the court relied on the conclusions of the multiple investigations and Trial testimony of various experts and recognized Parlato's lies for what they are. As a result, Plaintiff was awarded permanent sole physical and legal custody.

**C. Parlato maliciously and falsely published that Plaintiff admitted to viewing gay pornography and to producing child and gay pornography.**

18. Parlato makes additional efforts to put Plaintiff in a false light as someone obsessed with pornography. On October 3, 2021 Parlato published, "One computer expert, who forensically analyzed [Plaintiff's] two laptops stated that there was so much gay porn deleted from the computers that it is possible that he is creating or distributing porn." On October 12, 2021, Parlato published, "Forensic evidence suggests that not only did Ambrose visit the [gay porn] sites, he might be producing porn for some of the websites." On October 16 Parlato published, "[Plaintiff] has recently admitted he views gay porn. How could he deny it? Evidence shows he is addicted to porn…gay porn was his daily fare…" On April 26, 2022, "[Riordan] had evidence…that [Plaintiff] is doing some underhanded things…Like pornography. I believe he is making money illegally." Also on April 26, Parlato published that Riordan "had discs from computers as evidence" of Plaintiff's supposed involvement with porn. Parlato accompanies these statements with screenshots of websites supposedly proving that the porn involves children.

19. First, a basic reality check: if data is deleted from a computer, there is no way even an expert can say what that data was, it could have been porn or it could have been a grocery list. This reckless lie highlights Parlato's casual disregard for the truth and his willingness to say anything in order to destroy Plaintiff's reputation and bring him harm.

20. On information and belief, Parlato is also aware that Riordan has a history of claiming to have incriminating computer evidence that she never produces. As with the endless lists of child and gay porn websites supposedly visited by Plaintiff, which were too spurious for any of her five attorneys to ever raise in court, Parlato published that Riordan had other incriminating computer evidence against Plaintiff. Yet when the Trial judge ordered her to produce her laptop for inspection by a Special Master, Riordan was forced to admit that - after many days of lying about its location - she had intentionally and permanently destroyed the device along with all the evidence it supposedly contained. This occurred during the Trial, the record of which is publicly available. Parlato - yet again - omitted these facts form his published reports, never mentioned this spoliation of evidence for which Riordan was sanctioned, and so intentionally put Plaintiff in a damning false light.

**D. Parlato maliciously and falsely published that Plaintiff stole over $1 million from Riordan as well as an alleged six-figure inheritance.**

21. In *The Frank Report* on October 30 Parlato published, "[Plaintiff took] more than one million…from [Riordan's] share of the marital assets…[Plaintiff] succeeded in… subsuming all of the marital assets, and even [Riordan's] inheritance from her mother, which none of it [sic] was his…" On November 9 Parlato published, "[Plaintiff] literally stole the marital assets from [Riordan]." On November 14, "[Plaintiff] quietly transferred all the marital assets, and even [Riordan's] inheritance from her late mother, into accounts he controlled." On November 25, "[Plaintiff] secret[ed] the marital assets, which amounted to more than $2 million, including [Riordan's] six figure inheritance from her mother, which was hers alone."

On March 22, 2022, "As he admitted in court, [Plaintiff] confiscated... [Riordan's] share of the marital assets and admitted stealing her inheritance in open court." On March 28, "Before filing for divorce... [Plaintiff] confiscated her inheritance from her mother, money she inherited before the marriage. This he admitted under oath in a hearing. He had millions. His wife had nothing." On May 16, "[Plaintiff] admitted he took the marital assets and stole his wife's inheritance." On June 8, "[Plaintiff] stole the marital funds, stole his wife's inheritance... [Plaintiff] didn't convert [Riordan's] inheritance. [He] stole it in a criminal act of theft."

22.  Grand larceny is a felony under CGS § 53a-122.

23.  All of these statements were proven to be lies at the Trial.

24.  Plaintiff never "admitted under oath" or otherwise that he confiscated, converted or otherwise obtained any purported inheritance. To date, Riordan has not provided any evidence of an inheritance, the supposed value of which she has changed many times in her various versions of the narrative. If she received any money from her mother's estate, it's possible she deposited it in a private bank account unknown to Plaintiff. Riordan had a mutual fund worth approximately $30,000 which she kept secret from Plaintiff, who only learned about it 8 years into the marriage when the IRS issued a bill for failure to pay taxes on the fund.

25.  Riordan entered the marriage with very modest assets. After the marriage, other than tutoring one middle school student part-time, she never worked outside the home, even during the three years before the couple had children. Plaintiff was the sole provider throughout the entirety of the marriage, but there were never separate bank accounts for either of them, for an inheritance or anything else. Everything he earned and anything either party received - salary, residuals, gifts, dividends - regardless of the source was commingled. Again, this is all in publicly available Trial testimony, which was supported by bank and other financial records. Parlato apparently never reviewed any of this.

26.  During the Trial, Riordan's attorney cross-examined Plaintiff over the course of eight days, she asked many questions about his management of the marital assets. There was never any offer of proof to substantiate Riordan's allegations of theft of martial assets or the supposed inheritance.

27.  In *The Frank Report* on April 26, 2022, Parlato published a photo of a check drawn on the bank account of the tiny S corp that Plaintiff maintained for business purposes. The memo on the Dec 3, 2018 check read, "Bring account balance to zero." Zeroing out the business account was done at the end of every calendar for tax purposes. But portraying Plaintiff in a false light, Parlato's accompanying caption falsely stated that Plaintiff was emptying "the only bank account [Riordan] could access." The check was written over seven months *before* the couple even separated. Riordan had complete access to all bank accounts. This flagrant lie is yet another demonstration of Parlato's reckless disregard for the truth and invasion of Plaintiff's privacy by false light.

**E. Parlato maliciously and falsely published that Plaintiff is a "deadbeat" who did not financially support his wife once he filed for divorce in July 2019.**

28. In *The Frank Report* on December 14, Parlato published, "[Plaintiff]... failed to pay bills submitted by [Riordan, who] was unable to pay because [Plaintiff] had taken all her money." On March 28, "[Plaintiff] did not pay spousal support except for four monthly payments over 36 months."

29. Under CGS § 53-304, failure to support a spouse is a crime.

30. These statements are lies. As was definitively demonstrated at the Trial, between July 2019, when Plaintiff filed for divorce, and May 2021, when Riordan's fifth attorney asked for a formal support order, Plaintiff had *voluntarily* supported Riordan without any formal order from the court to do so. He paid every bill she presented, just as he had during the marriage.

31. Until May 6, 2021, Riordan used the couple's joint credit card. At Trial, Plaintiff provided uncontested testimony that, just as during the marriage, he didn't attempt to control Riordan's spending even when he thought it irresponsible or against his interest. For example, Plaintiff learned that Riordan had private detectives following him and that she was behind a "change.org" petition published on line in Jan. 2021, which falsely claimed he was a child molester, because she put those expenses on the joint card. As shown at Trial, Riordan's spending during this period (July 19, 2019 - May 6, 2021) - *on this card alone* - was well into six figures, all of which Plaintiff paid.

32. Bank statements from the same period (i.e., up to May 6, 2021) further disprove Parlato's allegations that Plaintiff didn't financially support Riordan. Using cash from the checking account, Plaintiff paid for Riordan's various expenditures, including: her $3500 monthly rent (throughout the entire 18 month lease term on her waterfront home); the bills from two credit cards that were in her name only; and any other bill (doctor co-pays, utilities, etc.) she presented to Plaintiff. Again, the total of cash payments made by Plaintiff on Riordan's behalf is well into six figures, which was demonstrated by bank statements.

33. Over the course of three months (July - Sept. 2021), Plaintiff wrote Riordan a half-dozen e-mails advising her that *in order to make the October 2021 support payment to her,* the family needed to sell stock in a mutual fund that required her signature. Without explanation, she repeatedly refused to provide her signature. To ensure that he wouldn't violate the support order, Plaintiff was forced to ask the court to direct the mutual fund to sell the stock on his signature alone *so he could pay Riordan.*

34. It is also important to note that in Sept. 2020, Riordan received nearly $200,000 as her share of the proceeds from the sale of the family's home in Westport. In 2021, Riordan testified that she had also unilaterally, covertly liquidated at least one pension fund (from the Greenwich Board of Ed), which she estimated netted her "over $100,000." So between September 2020 and July 2021, Riordan received at least $300,000 in cash payments, on which she paid no taxes. As established, during this same period, Plaintiff was paying all of Riordan's living expenses. She has never accounted for this large sum of money as it does

not even appear on her sworn Financial Affidavit. (It is also suspected that Riordan liquidated another pension account from the Southbury Board of Ed, but she stopped coming to court so this was never determined). Credit card statements, bank records, e-mails, court orders, cashier's checks and Trial testimony corroborated all of the claims in paragraphs 46-52.

35. On information and belief, Parlato was aware of these facts yet he maliciously and falsely published his allegations against Plaintiff invading his privacy by false light.

**F.   Parlato falsely and maliciously published that Plaintiff "hates" his children and was an absentee parent who abused his children by among other things, keeping them "caged," keeping them medicated, preventing them from communicating with anyone, isolating them from Riordan's extended family and friends.**

36. In *The Frank Report* on October 4, 2021, Parlato published, "There is a mountain of evidence that suggests [Plaintiff] is unfit [to parent]." On October 12, "[Plaintiff] threatened the children that if they spoke out he would ensure they would never see their mother again… took all their belongings…allowed his children, 14, 14 and 11, access to his gay pornography on his own phone, tells the children they are the liars and no one believes them… and many other sordid and disgusting things." On November 7, "[The] children have been mistreated and abused…should be removed immediately from [Plaintiff's] house and placed with a third party." On February 16, 2022, "[Plaintiff is] the unfit parent." On February 20, Parlato published a maudlin letter he addressed to the older son on his birthday, "Your father stole all the money that belonged to your mother – just before he filed for divorce. He planned all along to steal your mother's money and he wanted custody… because he did not want to pay money for your support, alimony and share the money that your mother and he owned jointly because they were married. I do not need to tell you he has no love for you." On February 28, "[Plaintiff] killed [the children's] pet." On April 3, "Who was alienating the children from [Plaintiff] — the father by his abusive behavior." On April 25, "[Plaintiff] worked to make his children not wish to see him. Being abusive, scaring them, this appeared to be his plan." On July 8, "[Plaintiff] had the children] put on medications they did not need…He belittles…abuses [the children]…He is menacing. He threatens [the children]….An abusive father." On July 9, "[The children] are currently on … illicit drugs and cutting themselves."

37. Child abuse is a crime under CGS § 53-21.

38. Falsely alleging that Plaintiff gives his children illicit drugs and medications they do not need, that they are "cutting" themselves is enormously distressing to Plaintiff, but far more upsetting to him is the humiliation and ridicule these lies have visited on his children. That Parlato so publicly invades their privacy - especially with lies - is nothing short of cruel, and brings Plaintiff enormous distress.

39. Prior to Plaintiff filing for divorce, there had never been allegations of abuse of any kind. Within two weeks after he filed, Riordan (and her associates) began calling the police and DCF, making dozens of allegations of serious sexual, physical and emotional abuse against

Plaintiff. These calls continued through March 2022. All of these allegations were investigated, often requiring the children to endure lengthy, intrusive and upsetting experiences. After thorough investigations, *every single allegation against Plaintiff was found to be baseless*. These results have been published in decisions by Judge Moukawsher on December 10, 2021 and January 25, 2022 and by Judge Adelman on April 26, 2022.

40. On information and belief, by the time Parlato published his first article, he was aware of the findings of these investigations, which had also been litigated and the subject of testimony at Trail. Even after the Trial court awarded Plaintiff permanent sole legal and physical custody of the children on April 26, 2022, Parlato continued to publish his false claims that Plaintiff abused his children.

41. In *The Frank Report* on October 12, Parlato published, "No Christmas, no gifts, no birthday cake, nothing any more [for the children]. That's not [Plaintiff's] way... [Plaintiff] snatched them from their home and by all accounts consistently abuses them." On February 28, 2022, "[Plaintiff] strips them of all their belongings, no internet, no phones, no gifts from relatives – to control and punish."

42. These are lies maliciously intended to invade Plaintiff's privacy by false light. Plaintiff and the children celebrate all holidays, including Christmas, Easter and the children's birthdays, with gifts, cake and dinner at the restaurant that became a family tradition long before July 2019. All of this is established in the custody evaluation and at Trial and corroborated with e-mails and other documentation. Parlato offers no substantiation for any of his false allegations.

43. In *The Frank Report* on October 30, Parlato published, "It must be clear to any thinking person that [Plaintiff] does not love [the children]". On November 7, "[Plaintiff] has shown no love or concern for [the children]... On March 28, 2022, "[Plaintiff] hates the children."

44. Plaintiff has always been a loving parent who has always - and continues - to make the best interest of his children his top priority. Despite Parlato's false claims, Plaintiff has consistently been very involved in their daily lives. He went to every parent/teacher conference and open school night, even those Riordan skipped because she "didn't respect" or wasn't getting along with the teacher. Unlike Riordan, he never missed a little league game or gymnastics meet. The pediatrician, dentist and audiologist said that Plaintiff was far more likely to bring the children to their appointments (all found Riordan difficult and troubled). This was established in the custody evaluation and in uncontested testimony at the Trial, which is publicly available.

45. In *The Frank Report* on October 3, Parlato published, "[Riordan] raised the children almost singlehandedly from infancy." On October 4, "[Riordan] raised them, almost solely, from infancy while the father was living apart, pursuing a writing career, mainly in Los Angeles." On October 6, "[Plaintiff] spent very little time with the children all their lives." On October 12, "[Plaintiff] was away most of their lives working in Los Angeles and New York pursuing his TV career, while the children lived in Connecticut with [Riordan]. The mother's family and network of friends; these were the people in the children's lives." On October 16, "What

kind of a man comes back into his children's lives after years, working away in another state, not really knowing them at all…?" On October 24, "[Riordan] raised the children for all of their lives, usually alone…During most of the children's lives, [Plaintiff] was off working 2500 miles [sic] away in Los Angeles." On October 30, "[Plaintiff] was always away in Los Angeles, while [the children] grew up in Connecticut." On November 7, "[Riordan] has largely raised the children on her own, with little to no help from [Plaintiff], who was living in California working as a tv series screenwriter… a virtual stranger to them after being away for most of their lives." On February 28, 2022, "[Plaintiff] worked away from home until [the youngest son] was… nine…[Plaintiff] was out of state during most of their childhood." On June 8, "These children lived…with their mother for 13 years. [Plaintiff] lived out of state or away from home for most of those years."

46. These statements are maliciously intended to falsely portray Plaintiff as an absentee, neglectful parent more concerned with his career than with his children. In fact, his actions show the opposite is true. Plaintiff's career required him to be in LA, but in 2010, Riordan decided she would only live on the East Coast, declaring it was more important to her that her extended family and former work colleagues have access to the children than it was to keep the family intact. So for six months in 2010, nine months in 2011 and four months in 2012, Plaintiff commuted cross-country every weekend (at great expense) in order to see his children. *Plaintiff had never before lived apart and when his contractual commitment was up after 2012, he never lived away again*, even though his career suffered as opportunities on the East Coast are much more limited in his business. Publicly available, <u>uncontested</u> Trial testimony corroborates all of this.

47. In *The Frank Report* on October 4, 2022, Parlato published, "[Plaintiff] isolates [the children] from contact with grandfather, aunt, cousins, godparents, family friends, and anyone who they knew all their lives living in Connecticut, connected with their mother." On October 10, "It is a rural home where the father keeps his children in virtual isolation. Not only may they not see their mother, but none of their relatives or family friends they've known since infancy." On October 12, 2021, "The children are not permitted to see any of their friends and family anymore…Friendships nurtured since kindergarten, eviscerated… Best friends, their grandpa, everybody. All gone… One aunt begged to see the kids and [Plaintiff] would not even let her glimpse them." On July 8, "[Plaintiff] has cut them off from their mother and all their family and friends they knew growing up."

48. Again, child abuse and neglect are crimes under CGS § 53-21.

49. The children are not "isolated" by Plaintiff at his home or anywhere else. Every day, they go to school, engage in activities, see friends (including at sleepovers) and have private therapy sessions. Plaintiff is not present for any of these interactions.

50. Plaintiff has never denied Riordan's family/friends access to the children. In fact, the children frequently text Riordan's sister and her children, which Plaintiff encourages, and they celebrated Christmas Eve 2021 at his home. Any of Riordan's extended family/friends who asked to communicate with the children has been able to do so. The children have not

seen two individuals from Riordan's "side" for cause. The first is Riordan's aunt, who supposedly "begged to see the kids." After she had had several FaceTime with the children, which Plaintiff arranged, one of the children showed Plaintiff an article published on October 12 in *The Frank Report* in which the aunt disparaged Plaintiff. The child asked Plaintiff, "Why is Aunt Barbara trying to make mom hate you?" Plaintiff later explained to the aunt that he felt he could no longer trust her to speak privately with the children. The other individual is Riordan's friend, Michelle Pawlina, who Plaintiff learned had made multiple false allegations of child abuse against him to DCF. Like the aunt, Pawlina was also collaborating with Parlato against Plaintiff. When a reader criticized Parlato in the "Comments" for publishing confidential info about the children, Pawlina responded defending him. She also gave Parlato a lengthy interview, published in *The Frank Report* on April 26, 2022, in which she makes the same brutal, false accusations against Plaintiff that are the subject of this action. Everyone else from Riordan's "side" who has asked has communicated with the children. This is corroborated in texts and e-mails as well as in uncontested Trial testimony.

51. The children have never been kept from any of their own friends; in fact, they communicate freely and frequently on their own and have had in-person visits with friends both old and new. Sadly, having seen Parlato's published articles, the parents of a few of the children's Westport friends have declined in-person visits for fear of bringing Riordan's retaliatory wrath on them or their children.

52. In *The Frank Report* on October 4, 2021, Parlato published,"[Plaintiff] took the internet away." On October 24, "[Plaintiff took] away the children's cell phones, land lines, computers and [keeps] them isolated in a rural home." On February 28, 2022, "[Plaintiff allows] no internet, no phones." On March 28, "[Plaintiff] took their cell phones and internet away so they could not continue to reveal his abuse."

53. These are all false statements. Since Plaintiff was first awarded custody in April 2020, each child has had a laptop with full access to the Internet. The children did not originally have phones because of stated concerns about Riordan's behavior. (e.g., her repeated texts to order the older son to accuse his father of abuse or when she hired a woman to use a false name and covertly text the daughter to say that Plaintiff was engaged in sex trafficking). In 2021, each child got their own mobile phone, over which they have full control, including while they're at school or otherwise away from Plaintiff. Occasionally as a parental consequence for behavior, the Internet or phone may be shut off for one of them, but not for longer than a few hours.

54. Parlato contradicts his own false claims that the children are unable to communicate by making additional false allegations. In *The Frank Report* on October 10 Parlato published, "The children, in their desperation, found…a contact number for [a third party paid to produce a YouTube video for Riordan] and reached out to him, hoping he would help them." No evidence supports any contact with this individual by any of the children. On March 28, 2022, Parlato falsely published that the children reached out to him,"without my prompting, just because they had temporary access to the internet and had seen my stories, the children

made desperate attempts to reach me to save them." In fact, it was one of the children who alerted Plaintiff to this false claim. And again, evidence proves the children *never* reached out to Parlato, who curiously never reported the children's supposed pleas for help. Embarrassingly, Parlato seems to have a desperate need to be seen as the children's white knight; in fact, the older two children read *The Frank Report* and have "Googled" him. They are well aware that he's facing 20 years in prison for fraud and was arrested recently for battery, false imprisonment and witness tampering. They fear him and are profoundly saddened that their mother is so intimately involved with him.

**G. Parlato falsely and maliciously published that Plaintiff was awarded custody because he lied in an affidavit and prevents Riordan from seeing the children.**

55. In *The Frank Report* on November 7, Parlato published, "[The judge] unilaterally stripped [Riordan] of her legal custody of her children based on a single false affidavit from [Plaintiff]…[Plaintiff] convinced Connecticut Family Court to place the children with the father and order no contact with the mother."

56. Giving a false written statement to any public servant is a crime under C.G.S. § 53a-157b.

57. It is well-established that Riordan lost custody because of her own egregious misconduct regarding the children, such as falsely telling them that Plaintiff stalked them and denied them financial support and, revealing a truly depraved heart, coaching them to say that Plaintiff sexually abused them, as explained in paragraph 6 of Section A herein.

58. Other alarming misconduct by Riordan, which was discussed at length in the custody evaluation and/or was uncontested Trial testimony, includes but is not limited to, Riordan: telling the children that Plaintiff is "like Michael Jackson" and so the younger son was not to be left alone with him; hiring a woman who advertises her role in child abductions to covertly text the daughter and falsely tell her that Plaintiff was being investigated by the FBI for producing child porn and sex trafficking; obtaining a restraining order on misleading pretenses to get custody, and when the order was vacated 24 hours later, hiding with the children in a hotel for two days, refusing to take calls from the judge or the police, who located her only after pinging her phone; hiring a private investigator who had been fired Bronx by the NYPD and had a long record of gang affiliations, witness tampering and strangulation charges and leaving him alone in a hotel room to film and interrogate the children about sexual abuse they supposedly suffered at Plaintiff's hands, then Riordan took them to a hospital to repeat what they had discussed with the disgraced former officer. Given this frightening history of parental misconduct, it's curious that Parlato published about Riordan,"[She] is an unimpeachable character. She is one of those rare souls in this world who is pure, who is honest, who never did a foul deed or commit [sic] a breach." (*The Frank Report*, October 30, 2021).

59. The experts and courts were also troubled by Riordan's intimate involvement with Parlato's vicious, very public campaign to invade Plaintiff's privacy by false light by publishing toxic, false narratives about him and the most confidential information about the children, including the custody evaluation which was under court seal.

60. *This* sort of misconduct - not an allegedly "false affidavit" from Plaintiff - led all the courts and the professionals (custody evaluator, guardian ad litem, the children's three therapists, the family reunification therapist, et al.) to determine that Riordan could not have custody and that her contact with the children must be supervised. This was all substantiated in publicly available Trial testimony, police reports, contempt of court orders, emails and the custody evaluation. It is now also summarized in the Memorandum of Decision published on April 26, 2022.

61. On information and belief, Parlato was aware that Riordan was *repeatedly* advised what Parlato was publishing subjected the children to public humiliation and emotional trauma. Parlato was also aware that the court issued a "gag" order directing Riordan not to share any information about the children with any bloggers, including Parlato. Both Riordan and Parlato showed contempt for this direct court order as well as the personal pleas to remove the posts Riordan's daughter wrote to her directly.

62. In *The Frank Report* on October 12, 2021, Parlato published, "[Plaintiff] has refused the children access to… their mother." On March 28, 2022, "In this case, Riordan cannot afford the therapist to supervise. Her money was stolen from her, and she is destitute." On June 14, "[Riordan] would have to admit to certain things in order to have the privilege of having a paid supervisor monitor her visits. She does not have the money and is unwilling to falsely admit or agree that she needs a supervisor."

63. These statements are lies and a further effort to invade Plaintiff privacy by false light. The court - *not Plaintiff* - ordered the conditions under which Riordan was to have visitation. Initially, these conditions included a no contact period, which Riordan violated almost immediately (with the burner phone) and so was held in contempt. The conditions also included that Riordan was to be supervised.

64. In July 2020, the parties signed a supervised visitation stipulation, which specified that a professional supervisor was to be selected and paid <u>from joint funds.</u> Within 48 hours of this selection, Plaintiff submitted his paperwork, had the required interview and paid the $7500 retainer *in full* from marital funds. Riordan waited nearly four months before even contacting the supervisor then never completed the paperwork or in-take. She never requested a supervised visit. *<u>Riordan did not have to pay anything nor did she have to "admit to certain things," as Parlato falsely published</u>*.

65. As Riordan continued to ignore court orders, including by feeding Parlato more confidential information about the children which causes them trauma, *the court* - not Plaintiff - further restricted her contact with them. The only ones responsible for Riordan's no custody/ visitation situation are Riordan herself and those, like Parlato, who aid and abet her egregious misconduct and enable her aggressive impulses. Plaintiff has always followed the court orders and continues to do so.

**H. Parlato falsely and maliciously published that Plaintiff always wanted sole custody and all the marital assets for himself so he lied and colluded with and/or bribed the court-appointed Guardian ad Litem, custody evaluator and others.**

66. In *The Frank Report* on October 30, Parlato published,"[Plaintiff wanted] permanent and exclusive custody of the children…[to] avoid alimony and child support and keep all the marital assets." On November 7, "[Plaintiff] made it clear to [Riordan] that any attempt to divorce him and take the children would be met with fierce resistance. Once [Riordan] moved out with the children, [Plaintiff] followed up on his threats by conceiving a web of lies."

67. These are false statements. As the publicly available records show, it was Plaintiff - not Riordan - who filed for divorce - and *he requested shared custody and a 50-50 split of all assets*. This is the polar opposite of Parlato's tediously repetitive, insistent claims that Plaintiff sought to keep the children from their mother and to leave her destitute. This was publicly available information when Parlato published his very first article. Despite what Parlato writes, Riordan didn't "move out with the children." She brought the police - who had never been involved with the family before - to the home to gather things, then took the children out of state, refusing to say where she was going or when/if she was returning. Plaintiff later learned (from police reports and his children) that Riordan had reported that he was stalking them, she confiscated the children's phones and changed her own number. Plaintiff had to involve the court to get her to return the children to the state.

68. In *The Frank Report* on October 6, Parlato published, "It is not lost on everyone (at least not GAL Hurwitz) that [Plaintiff] is the one who controls the money and that he has slyly agreed to permit unusual, [excessive] billings for Hurwitz…[Plaintiff] also wants very much for the Guardian to stay on – billing at her regular $400 per hour rate – after the trial is finished, to [keep Riordan] away from the children, at least until the divorce is settled and it is decided that Ambrose does not have to pay a dime in child support…That swift move alone – based on Ambrose's past income – more than makes up for the measly $178,000 Hurwitz has charged and the future $178,000 or more she is going to charge, working for such a generous and soulful father." On October 10, [The GAL knew that] "billing is dependent on one custody recommendation – custody to the father, exclude the mother…[Plaintiff] always agreed to allowing Hurwitz to bill more hours… for whatever he pays to Hurwitz as the children's guardian, he will save in the end in whopping child support and alimony." On October 16, "[Plaintiff] knew he could buy lawyers and he could buy a [custody evaluator]… He knew that whatever he paid to unprincipled lawyers or a corrupt psychologist in the short run, would be less than alimony, child support, and the division of marital assets in the long run." On February 16, 2022, "It is no secret that Hurwitz pushed for Biren-Caverly to be the custody evaluator and Biren-Caverly returned the favor by handing down the report exactly as Hurwitz desired – with an outcome that would ensure the best return on their investment – i.e. the father gets custody." On March15, "[Plaintiff] did buy custody in that marketplace called CT Family Court, but with stolen money — [Riordan's] money, money that he stole from the marital funds, and her inheritance, just before filing for divorce." On March 18, "[Plaintiff] bought the children from the CT Family Court Market." On March 28, under a headline reading, "Ambrose Children Are Suffering After Being Sold in CT Family Court," Parlato published, "[Plaintiff] is a cruel ass, a cunning man…because [Plaintiff] had the money and because he had CT family court – he could buy the children like you might buy a

dozen eggs at the market... [The children] were sold to a man they disliked and now despise for what he has done to them." On April 26, "[Plaintiff] purchased custody of the children... [Plaintiff] took the children. He paid for them...[The court] took the kids away from [Riordan] on the strength of [the evaluator's] bought-and-paid opinion....[Plaintiff] researched all the players, including Jocelyn Hurwitz, for guardian ad litem," On June 8, "[Plaintiff] bought custody of his children and made his wife destitute... [Plaintiff] showed his talents in stealing children and money via CT Family Court." On July 8, "[Plaintiff's attorney] got the court to appoint a guardian ad litem, Jocelyn Hurwitz of Cohen and Wolf. GAL Hurwitz arranged for custody evaluator Dr. Biren-Caverly."

69. Conspiracy is a crime under CGS § 53a-48.

70. The statements in paragraph 68 are lies and a malicious invasion of Plaintiff's privacy by false light. It was not Plaintiff's attorney but the first of Riordan's five attorneys who requested that a GAL be appointed. That attorney also agreed to the judge's choice of Hurwitz. Likewise, it was Riordan's attorney who recommended the custody evaluator who was chosen, not the GAL as Parlato published. Plaintiff did not "research" anyone. This is was all in the Trial testimony, supported by contemporaneous e-mails and court documents, and this sloppy reporting demonstrated "journalist" Parlato's reckless, utter disregard for the truth.

71. The GAL and custody evaluator were agreed to by both parties and hired with written contracts, reviewed by Riordan and her attorneys. Plaintiff never had - and does not have now - private arrangements of any kind with either of these professionals. Each was paid only what was contracted. The evaluator's fees were paid from joint funds, as provided by the court; the GAL is still owed significant sums by both parties, as is established in the April 26 Memorandum of Decision. These issues were the subject of publicly available Trial testimony, which was corroborated by emails, the contracts, bank, credit card and billing statements. As is typical in this matter, Paralto provides no substantiation for his malicious, invasion of privacy by false light allegations.

72. In *The Frank Report* on April 26, 2022, Parlato published, "[Plaintiff] got the judge switched and suddenly, [Plaintiff] has full custody."

73. Plaintiff did not know Judge Rodriguez or Judge Grossman and had nothing to do with who was hearing the case. If Parlato, Riordan or any of her five attorneys had evidence of such conduct, it would have been reported long before now. Parlato is also aware that false allegations of criminal conspiracy involving judges resulted in Riordan's fifth attorney being disbarred. His abject disregard for facts, even in the face of serious consequences, demonstrates Parlato's contempt for the truth.

**I. Parlato falsely and maliciously published that Plaintiff illicitly colluded with the GAL, custody evaluator, attorneys, judges, police officers and detectives, DCF investigators and caseworkers, hospital doctors, nurses and social workers, elected and appointed public officials and others in a vast "RICO" conspiracy to deprive Riordan of custody and her due process rights.**

74. Parlato maintains that Plaintiff was an active participant if not a leader in a massive conspiracy against Riordan. In *The Frank Report* on October 10, he published, "To say that any [attorney] would be driven by money over the interests of children is a hard thing to say. That an attorney could game the system to accomplish this was impossible...to believe. It is a simple formula. Family Court... appoints... guardian ad litem. The guardian starts billing hard. To execute maximum billings, she plans to arrange to remove the mother from the family. To get the optics covered, she refers a psychologist who will do a custody evaluation report, which will lead to a baseless 'determination' that the children should go with the father... The judge in turn sides with the recommendation of the guardian ad litem backed by the psychologist. But not at once. [sic] A number of hearings, court appointments, motions, and of course the trial must occur. But the result is a forgone conclusion..." On October 16, "[Plaintiff] is crafty, unlike many other parents with money, he does not have to be manipulated... He knows that family court operates for the welfare of lawyers. He knows that whenever a family with money comes into their field...[lawyers, including the GAL] work together to create confusion, contention, to select the wrong parent, then rake in fees from the fight between them. They are aided and abetted by the judges, who are, after all, lawyers themselves, who through influence and party boss support, which means the support of lawyers, donating lawyers, are appointed by the governor... [Plaintiff] helped them... let them know he would cooperate [by paying them to "rig" the case in his favor]." With no evidence whatsoever, Parlato falsely states that still others were involved in this conspiracy. On December 14, Parlato alleged, "An investigation was truly warranted. But a strange thing happened. [Madison Police Department] Detective DeGoursey later testified that he relied on the investigation he believed was being conducted by the Department of Children and Families' William [sic] Villanueva. Villanueva, however, said he relied on an investigation by the Madison Police Department... This resulted in the fact that two agencies in place for the safety and well-being of the children did nothing to investigate allegations of sexual abuse. Judge Adelman ignored evidence of educational neglect, emotional abuse, medical neglect, and sexual assault of the children. Instead, he determined to punish [Riordan]." on February 18, "It is a textbook case of corruption by sinister actors. If the FBI does not investigate, and the DOJ does not impanel a grand jury to indict, and a jury to convict for their RICO enterprise, it will be a shocking result. It's coming." On March 28, 2022, "These allied thieves have helped steal these children and gave them to the thief who stole the marital assets and his wife's inheritance....Until somebody outside the corruption commences a massive criminal investigation into this corruption, this kind of selling of children will not end....The Family Court actors suppressed all the evidence." On March 28, 2022 Parlato also published that Connecticut family court judges, attorneys and others use "code" when communicating with each other.

75. Conspiracy is a crime under CGS § 53a-48. The federal RICO statutes, which Parlato insists apply, are at 18 U.S. Code § 1962.

76. Parlato incorrectly published that Judge Grossman, who is frequently defamed in his articles, appointed the GAL. In fact, the GAL was requested by Riordan's attorney and appointed by Judge Rodriguez, literally the only judge Riordan has not defamed. Rodriguez made the

appointment of the guardian after learning that Riordan had used the police to enable her to flee the state with the children.

77. Contrary to Paralto's assertions, Judge Adelman did not "ignore" any evidence, especially as it pertained to the children. His thoroughly detailed, well-reasoned April 26 Memorandum of Decision makes this clear. Parlato seems to think if the judge - or anyone - doesn't agree with his (i.e., Riordan's) point of view, the individual must be corrupt and illicitly working with Plaintiff.

78. Parlato's claims about DeGoursey's and Villanueva's testimony are demonstrably false. Both of these professionals testified at Trial that they *each separately* investigated allegations of abuse and each *personally* spoke to the children and to Plaintiff at different times, and *each independently reached the same conclusion: the children had been coached by Riordan about the abuse*. Their Trial testimony and separate "after action" reports corroborate this.

79. To understand the extent of the vast conspiracy Parlato alleges that Plaintiff orchestrated, every one involved in the case since Plaintiff filed for divorce three years ago would have to be involved. This includes:

- At least 12 judges in five courthouses (*nine of them were involved solely due to Riordan's forum shopping, frivolous motions and lawsuits, all of which have been denied/dismissed*);
- Plaintiff's attorney;
- Riordan's five different attorneys; *three Riordan fired, one quit and one was disbarred for her conduct in this case;*
- The GAL, *appointed at Riordan's attorney's request and recommended by him;*
- The custody evaluator, *recommended by Riordan's attorney;*
- The three therapists who work with the children, *two of whom Riordan selected;*
- The reunification therapist, *agreed to by Riordan;*
- Doctors, nurses and social workers at two of the most respected hospitals in the country (Yale New Haven and Connecticut Children's), *all involved due to Riordan's direct actions or allegations that were later determined to be the result of coaching by Riordan;*
- Police officers and detectives from the towns of Westport, Guilford and Madison, CT, *all brought into the case due to false allegations of abuse by Riordan and/or her associates;*
- Troopers and detectives from the Connecticut State Police, *involved by Riordan and one of her two private investigators;*
- Teachers and administrators at four different schools;
- Multiple case workers, investigators and supervisors from DCF offices in Fairfield, New Haven and Middlesex counties, *all of whom were involved due false allegations against Plaintiff made by Riordan or her associates;* and
- Connecticut's Governor, Attorney General, Chief of State Police, Commissioner of DCF, and other named officials, *all involved because Riordan sued them for conspiring against her*. (That suit was dismissed for failure to prosecute, as were other suits Riordan filed in connection with this case, including a malpractice suit against the custody evaluator).

80. According to Parlato's published conspiracy theory, Plaintiff allegedly manipulated all of these people - *virtually all of whom were brought into the case by Riordan* - to give him custody of the children *even though* they knew he was a pedophile who would molest them.

81. Parlato's theory also requires that the colleagues, supervisors and subordinates of each of these co-conspirators remained silent about this diabolical plot, and that the media collectively has continued to ignore this sinister cabal that Parlato boastfully claims to have exposed and continues to publicize, even as the media wrote about other aspects of the case, such as Riordan's attorney's anti-Semitism and her misconduct, which included making this same dangerous conspiracy theory in court.

82. Parlato has published this preposterous conspiracy theory even though he is aware that it has been decisively debunked in court and Riordan's fifth attorney was permanently disbarred - in part - for alleging this same wildly unfounded theory.

83. In *The Frank Report* on November 7 Parlato further alleged that these same co-conspirators worked on Plaintiff's behalf to deny Riordan's due process rights, "[Riordan] was NEVER permitted to testify on her own behalf, NEVER permitted to cross examine, NEVER permitted to call her own witnesses, NEVER permitted to present evidence. Karen NEVER got to speak at all." (Emphasis is Parlato's).

84. Parlato is aware that Riordan was represented by counsel. She fired three attorneys of her choosing, one quit, the last was disbarred for, according to the Writ of Error she filed with the court on April 11, 2022, prosecuting the case exactly the way Riordan ordered.

85. Parlato is also aware that Riordan's lawyer cross-examined Plaintiff over the course of eight days and examined every other witness as well. Parlato also knows that when Riordan was scheduled to testify, she stopped coming to court. She later claimed she had Covid, though refused to provide a doctor's note, and suffered financial hardship, which was determined by the court to be specious. It is Riordan who deprived herself of due process by not participating in the judicial process. In fact, it is Riordan who deprived Plaintiff of his due process right to cross examine her. These published falsehoods constitute yet another instance of Parlato's invasion of Plaintiff's privacy by false light.

**J. Parlato falsely and maliciously published that Plaintiff misrepresented his sexuality and was unfaithful during marriage by leading a "double life" that included an illicit "gay lover" and "multiple, multi-year affairs."**

86. In *The Frank Report* on October 3, 2021, Parlato again referenced the court-sealed custody evaluation and published, "[Plaintiff's] true sexual desires, he admitted, are for anything but a woman." On October 12, 2021, "Ambrose was leading a double life...secretly living out his fantasies, which if they were anything like the websites found on his computer, it involved [sic] fathers introducing their Latino sons into oral and anal sex." Parlato goes on to state that Plaintiff joined his family on vacation only when he "was not immersed [sic] with a gay lover in Los Angeles."

87. While married, Plaintiff never had a lover - gay or straight - and no one, including Riordan, has ever made that allegation against him, which is why it was never mentioned by any of Riordan's five attorneys. This lie originates with Parlato. Likewise, Plaintiff never claimed to anyone that his desires are "for anyone but a woman." Paralto offers no substantiation for his false accusations. By maliciously accusing Plaintiff of lying about his sexuality and of being unfaithful, Paralto is invading Plaintiff's privacy and portraying him in a false light in a transparent attempt to embarrass him and destroy his reputation. Again, this says more about Parlato's own psyche and predilections than about Plaintiff's.

88. In *The Frank Report* on April 26, Parlato published a screen shot of a handwritten note along with the caption,"[Plaintiff's] note identifies concerns about the implications of his multiple, multi-year affairs that would impact custody and child support payments." In fact, the note was a reference to affairs he suspected *Riordan* of having and which were the subject of Trial testimony and of contemporaneous emails Plaintiff wrote in 2011 and 2012 about an affair he suspected Riordan had at that time and indicated her friend Pawlina would covered up. Again, no one, including Riordan ever accused Plaintiff of having an affair, this is another invasion of privacy by false light.

89. Parlato obsessively publishes that Plaintiff is supposedly engaged in any number of fetishes, which he asserts are sexual in nature. The only "evidence" he offers are screenshots from computers and phones that supposedly belonged to Plaintiff. As explained, these allegations and "proof" are so specious they were never mentioned in court by any of Riordan's five attorneys. And again, these allegations offer a window into Parlato's imagination, which he uses in yet another false light invasion of Plaintiff's privacy in a malicious effort to humiliate and embarrass.

**K. Parlato maliciously and falsely publishes that Plaintiff is psychologically unwell, has a drinking problem, anger issues and is paranoid and delusional.**

90. In *The Frank Report* on April 26, 2022, Parlato published an interview with Michelle Pawlina, Riordan's friend who has made false allegations of child abuse against Plaintiff. In the published interview, Pawlina states, "I've known [Plaintiff] for 25 years…I pick up shifts in two different hospitals, psych, adolescent, and adult, so I'm very familiar with abnormal behavior… I also work in the psych field in the hospital… so I'm very familiar with abnormal behavior….[Plaintiff] is a sick man. He's not behaving logically… [Plaintiff] became more and more controlling. He was getting more irrational…He treats his children like a 'bully.'"

91. On information and belief, Parlato published Pawlina's self-described professional credentials to create the deceptive impression that her statements come from an informed clinician who made a professional assessment over time. In so doing, Parlato attempts to provide weight to her derogatory statements about Plaintiff. But her assessment had been debunked and opinion is privileged as fair comment only when the facts on which it is based are truly stated or otherwise known because the facts are of common knowledge. Neither of these circumstances apply here. The facts are not truly stated or otherwise known to the

audience, for Parlato omits the material information that the custody evaluation, the Trial testimony of mental health professionals and the Memorandum of Decision published on April 26, 2022 determined that Plaintiff is psychologically stable, which is why he was awarded sole custody. Moreover, opinions which invade the legitimate expectations of privacy of the person about whom the opinion was stated are not protected. Therefore, Parlato published these statements without privilege or justification and invades Plaintiff's privacy by false light.

92.  Parlato also falsely accuses Plaintiff of having a drinking problem and anger issues. In *The Frank Report* on October 12 Parlato published, "[Plaintiff] engages in excessive drinking (GAL Hurwitz blamed Ambrose's drinking on [Riordan])." On February 28, "[Plaintiff] got drunk, excessive drinking, [sic] and yelling, screaming, issuing threats and intimidation [to the children]."

93.  Not even Riordan ever made these accusations against Plaintiff, they appear to be more of Parlato's gratuitous, wholly fabricated imaginings intended to further destroy Plaintiff's reputation and invade his privacy by false light.

94.  Parlato falsely alleges that Plaintiff is paranoid and acts erratically. In *The Frank Report* on April 21 Parlato published, "[Plaintiff] sees things at the end of his driveway and hears from imaginary callers who he thinks are *Frank Report* readers." On April 26, "[Plaintiff] imagines he sees cars idling at the end of his driveway. And unknown people calling him from unknown numbers….[Plaintiff] was kicked out of Guilford Planet Fitness. Why? Another source said he takes furtive pics of muscular, youthful men there."

95.  Plaintiff has reported the idling cars to the Madison Police, just has he reported the three unfamiliar men who entered his property on two different occasions demanding to check on the welfare of the children. The police spoke with each of these men (who have not returned). The multiple obscene, attacking voicemails are still recorded and in the possession of the police. The incident described at Planet Fitness is a complete fabrication. The only incident at Planet Fitness occurred when Thomas Martin, who described himself under oath on the stand as a"close friend" of Riordan's who spends nights at her house (before she met Parlato), approached Plaintiff at the gym in an effort to intimidate him the day before he was to testify. That incident was reported to the Guilford Police, who also spoke with Martin, and it was the subject of testimony at Trial, along with testimony from the long list of other witnesses Riordan and her associates had tried to intimidate.

96.  Parlato identified Plaintiff and published all of the false statements described under sections A - K above in 48 articles in *The Frank Report,* which he then republished on other sites, including those targeting the Connecticut audience. When material is published on the Internet it must be regarded as substantially certain to become public knowledge. Publishing on multiple sites not only increases the number of people likely to see the false light statements, it enables more meta tags and links to be utilized to draw traffic to those sites and so increases over time the damage done to Plaintiff as search engines "drive" readers to those sites in perpetuity. Furthermore, as explained, Parlato specifically "advertises" the articles he

published about Plaintiff on other social media venues in a malicious effort to falsely portray Plaintiff to as wide an audience possible.

97. The statements described under Sections A - K accuse Plaintiff of behavior involving moral turpitude, such as child sexual abuse, viewing and producing child pornography, grand larceny and conspiracy; the conduct alleged under Sections A - I are crimes of moral turpitude.

98. All of these false statements are such major misrepresentations of Plaintiff's character, history, activities and beliefs that serious offense may reasonably be expected to be taken by a reasonable person.

99. Parlato made all of the statements in Sections A - K with knowledge of their falsity or, alternatively, with a reckless disregard for their falsity. Therefore, he had an improper and unjustifiable motive - actual malice in fact. Parlato's malice is demonstrated further still by his many published taunts, as when he promised that "more" lies and false accusations will be forthcoming.

100. Parlato's published, life-altering lies about Plaintiff have destroyed Plaintiff's reputation and exposed him to public hatred, contempt and ridicule. Parlato's lies have pulled apart Plaintiff's extended family and destroyed personal relationships with friends, colleagues and former neighbors. The psychological damage done by the sort of false light invasion of privacy Parlato has relentlessly engaged in over any months is severe and can cause suicide and attempted suicide. It has resulted in a diagnosis and need for treatment for Plaintiff. Parlato's very public, false allegations of crimes of moral turpitude have also deprived Plaintiff of business opportunities. Executive recruiters confirm that in today's market, every employer checks a candidate's Internet profile, and the false accusations of immoral, even unlawful conduct that Parlato has published have made Plaintiff "unemployable." This has only added to Plaintiff's emotional harm. Parlato's actions constitute a false light invasion of Plaintiff's privacy and have brought extreme emotional distress and catastrophic financial damage to Plaintiff.

101. That Parlato's published falsehoods have incited people to hate Plaintiff is apparent from the comments of his own readers, who make blistering, libelous statements and threats, all of which Parlato publishes. Not surprisingly, virtually every one of these comments published by Parlato are attributed to "anonymous".

102. Parlato often publishes confidential material to give his a veneer of credibility and "insider" knowledge to his false assertions, even as he omits material facts and context that create a wholly false light impression of Plaintiff.

103. As a proximate result of Parlato's malicious false light invasion of Plaintiff's privacy, Plaintiff has suffered and will continue to suffer actual, consequential and/or incidental damages to his emotional and financial health in an amount to be determined at trial.

104. Parlato may attempt to claim that some of what he writes is opinion. However, opinion is privileged as fair comment <u>only</u> when the facts on which it is based are truly stated or otherwise known because the facts are of common knowledge. Neither of these circumstances apply to any of the above-described statements. Moreover, opinions which invade the legitimate expectations of privacy of the person about whom the opinion was stated are not protected. Therefore, Parlato made these statements without privilege or justification.

105. As explained, on April 14, 2022, Plaintiff gave Parlato the opportunity to correct his many lies. Plaintiff sent Parlato a letter via USPS and e-mail requesting that Parlato detract his false statements in as public a manner as that in which they were made. Plaintiff gave Parlato reasonable time (ten (10) days) to comply with this request. It has now been approximately ninety (90) days, not only has Parlato not retracted the falsehoods, shown any remorse or taken responsibility for the harm he has caused (even to Plaintiff's children), he has continued to publish *additional* articles accompanied by *newly* exposed confidential documents, and continues to childishly taunted Plaintiff using headlines like, "Sue Me" and mocking Plaintiff for suggesting that public humiliation may lead to thoughts of suicide.

106. Parlato's publications of false statements about Plaintiff were independently wrongful and done with actual malice and constitute invasion of privacy by false light as defined by The Second Restatement of Torts and proscribed by Connecticut common law.

107. Pursuant to CGS § 52-237, Plaintiff is entitled to all damages available at law, including compensation for mental suffering, reputational damage, loss of business profit and employment suffered as a result of Parlato's acts in an amount to be determined at trial.

## <u>SECOND CAUSE OF ACTION</u>

### (Defamation at Common Law and Connecticut General Statutes § 53-237)

1. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

2. Parlato has published at least 48 different articles that defame Plaintiff. Within each article, Parlato tediously repeats - often many times - the same false statements, then repeats them again in subsequent articles, which are then often re-published in full on still other sites. In order to make this Complaint manageable, not every instance of each defamatory statement will be referenced; in fact, not even every article in which the defamatory statements are made will be referenced. But it should be understood that *virtually every defamatory statement identified herein is made more than once, not only within each article, but in subsequent articles, and then often re-published on multiple venues, which increases the number of people of who may see the statement and therefore increases the harm done to Plaintiff.*

3. Pursuant to Connecticut case law, defamation is defined as, "that which tends to injure 'reputation' in the popular sense; to diminish the esteem, respect, goodwill or confidence in

which the plaintiff is held, or to excite adverse, derogatory, or unpleasant feelings or opinions against him." W. Prosser & W. Keeton, Torts (5th Ed. 1984), p. 773.

4.   The statements described in Sections A - K above, which Parlato published on multiple websites in which he identified Plaintiff by name and photos, are false, as demonstrated at length herein, and all convey a defamatory meaning in that they harm Plaintiff's reputation as to lower it.

5.   The statements described in Sections A - K above are not only defamatory, they falsely accuse Plaintiff of conduct of moral turpitude - the statements under Sections A - I even allege *crimes* of moral turpitude and therefore are libelous per se.

6.   Parlato either knew that each of the statements he was publishing were false or displayed reckless disregard of whether they were false. Therefore, Parlato's publication of these false statements also shows a sinister or corrupt motive to injure Plaintiff, or such gross indifference and recklessness as to amount to wanton or willful disregard of rights of Plaintiff, in a word, malice.

7.   Parlato intentionally and wrongfully made the above-described defamatory statements knowing that his actions were certain or substantially certain to injure Plaintiff's reputation and so cause him harm - emotionally and financially - including but not limited to by preventing him from reasonably being able to find employment.

8.   An opinion is privileged as fair comment only when the facts on which it is based are truly stated or otherwise known because the facts are of common knowledge. Neither of these circumstances apply to any of the above-described statements. Moreover, opinions which invade the legitimate expectations of privacy of the person about whom the opinion was stated are not protected. Therefore, Defendant made these statements without privilege or justification.

9.   As explained, Plaintiff offered Parlato an opportunity to correct his lies. Plaintiff sent the Letter requesting that Parlato detract the false statements in as public a manner as that in which they were made, and gave him more than reasonable time to comply with this request. Parlato has not retracted the charges and, manifesting his malice, has since published *additional* articles that defame Plaintiff. Therefore, under Connecticut General Statutes §52-237, Plaintiff is entitled to compensatory damages.

10. Pursuant to CGS § 52-237, Plaintiff is entitled to all damages available at law by statute and common law, including compensation for mental suffering, reputational damage, loss of business profit and employment suffered as a result of Defendant's acts in an amount to be determined at trial.

11. Parlato's actions were independently wrongful and were proscribed by common law defamation, and meet the tests for actual malice and libel per se.

12. Parlato has knowingly engaged in highly reprehensible and despicable conduct warranting Plaintiff be awarded damages to be determined at trial.

## THIRD CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress at Common Law)

1. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

2. Parlato has published at least 48 different articles that have intentionally inflicted emotional distress on Plaintiff. Within each article, Parlato tediously repeats - often many times - the same false statements, then repeats them again in subsequent articles, which are then often re-published in full on still other sites. In order to make this Complaint manageable, not every instance of each false statement will be referenced; in fact, not even every article in which the false statements are made will be referenced. But it should be understood that *virtually every false statement constituting intentional infliction of emotional distress identified herein is made more than once, not only within each article, but in subsequent articles, and then often re-published on multiple venues, which increases the number of people of who may see the statement and therefore increases the harm done to Plaintiff.*

3. As explained above, Parlato maliciously set out to inflict emotional distress on Plaintiff by publishing falsehoods about him, including crimes of moral turpitude. These false statements have severely harmed Plaintiff, including by interfering with his ability to find work, and have brought him great emotional distress.

4. In considering intentional infliction of emotional distress, it bears emphasis that the primary focus is on the question of *foreseeability* and not on the physical manifestation of the emotional injury. Any reasonable person would foresee that Parlato's published falsehoods about Plaintiff, which include that he sexually and emotionally abused his children, is addicted to child porn, produced child and gay porn, has had multiple, multi-year extramarital affairs, stolen over $1 million from his spouse, bribed and conspired in order to obtain custody and deprive his spouse of her rights, has drinking and anger problems, frequently lies and threatens others and hates and mistreats his own children, would result in an unreasonable risk of causing Plaintiff emotional distress. Moreover, Parlato was made aware that his published falsehoods were doing just that after Plaintiff sent the Letter on April 14, in which he stated as much. Parlato responded to the Letter by further publicly mocking and taunting Plaintiff. In *The Frank Report* on April 21, 2022, he published the headline, "Is Chris Ambrose Becoming Ungluded?" On June 8 he addressed Plaintiff directly, "You don't need mental health help. And I doubt you are the suicidal type. You are more likely to drive others to suicide." After receiving the Letter, Parlato also published additional articles, all containing false, defamatory allegations, which only exacerbated Plaintiff's emotional harm.

5. In *The Frank Report* on June 8, Parlato flatly admitted that his articles were likely to cause Plaintiff emotional distress, "***Frank Report* posts about [Plaintiff] may inflict emotional distress.**" This shows Parlato's awareness that his reckless disregard for the truth and relentless libelous statements about Plaintiff would cause emotional harm.

6.   In that Parlato publicly, falsely accused Plaintiff of the most morally repugnant crimes, his conduct is so extreme and outrageous as to exceed all bounds usually tolerated by decent society.

7.   Parlato's intentionally false, public depiction of Plaintiff goes beyond merely publishing false the statements described above in Sections A- K. Parlato also frequently notes that Riordan, who was married to Plaintiff for 15 years, is his source and therefore has "insider" knowledge, giving a veneer of credibility to her statements. In fact, Riordan's credibility is non existent since she has been held in contempt for perjury and spoliation of evidence in this case. Also, Parlato publishes often confidential documents that purport to support his falsehoods, but he omits material facts and so changes the meaning of those documents in order to falsely portray Plaintiff. This extra layer of deception has caused Plaintiff additional anxiety for he fears the public will give Parlato's false statements undue credibility and so be more likely to believe his published lies.

8.   A foreseeable, proximate result of Parlato's intentional, egregious conduct was Plaintiff suffering significant emotional distress, including depression, anxiety and other serious conditions associated with such stress.

9.   Parlato's conduct was extreme and outrageous - that is, conduct exceeding all bounds usually tolerated by decent society - and is of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind.

10. The severe emotional distress sustained by Plaintiff as a result of Parlato's intentional misconduct entitles him to damages, which shall be determined at trial.

11. Plaintiff has no other adequate remedy at law for the injuries he has suffered and will continue to suffer as a result of Parlato's malicious, unlawful acts.

12. Unless restrained by this Court, Parlato will continue to pursue his malicious and unlawful conduct, including but not limited to defaming Plaintiff, invading his privacy by false light and subjecting him to severe emotional distress, all of which have harmed and will continue to harm Plaintiff emotionally and financially.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully prays for the following:

1. Monetary damages in demand are greater than $15,000, exclusive of interest and costs;

2. Equitable relief as follows:

    1. An order enjoining Parlato to immediately remove from *TheFrankReport.com,* artvoice.com and any other site/publication Parlato controls, including his Twitter and Instagram accounts, all false remarks and accusations concerning Plaintiff and all references to his minor children, including confidential information about them;

    2. An order enjoining Parlato to immediately cease and desist publishing false statements about Plaintiff or sharing any information about his minor children, whether the statements are made by Parlato or by third parties;

    3. An order enjoining Parlato to immediately publish on *TheFrankReport.com, art* voice.com and any other site/publication he controls on which his false statements about Plaintiff were published (including his Twitter and Instagram accounts): a) a retraction of all of his false statements about Plaintiff. The retraction shall not state that he is publishing the retraction in response to court order or that Plaintiff denied his accusations. The retraction must be a frank and full acknowledgement that what he published about Plaintiff were lies; and b) an apology written by Parlato to Plaintiff and his children for the many false statements about Plaintiff and invasions of privacy by false light as well as his violations of the children's privacy by publishing private, confidential information about them, which has brought the children and Plaintiff harm. The apology must be frank and full, a weak, grudging or half-hearted effort will not suffice. Both the retractions and apologies must appear in the manner comparable to that of his original statements and must be disseminated to the same audiences.

    4. An order enjoining Parlato to immediately send a written letter to all other sites on which his false statements about Plaintiff were published, including but not limited to those identified herein, requesting that the site immediately publish the same a retraction and apology that Paralto wrote pursuant to paragraph 3 immediately above. The request should ask that the retraction and apology be published in the manner comparable to that of his original statements and be disseminated to the same audiences. Stating that he is requesting the retraction and apology in response to court order or that Plaintiff denied his accusations will not do. His request must be for a frank and full acknowledgement that his allegations were false and that he was wrong to publish them. All such written requests are to be shared in full with Plaintiff when they are made; and

    5. An order enjoining Parlato to refrain from engaging in further libelous and/or retaliatory conduct of any kind toward Plaintiff or his minor children;

3. Costs and interest to the extent provided for by law; and

4.  Such other and further relief as the court may deem equitable and just.

DATED: July 12, 2022

THE PLAINTIFF

Christopher Ambrose
381 Horsepond Road
Madison, CT 06443
203.505.1889
ca0515@aol.com