# UNITED STATES DISTRICT COURT
## District of Connecticut
### New Haven Division

---------------------------------------------------

CHRISTOPHER A. AMBROSE,

         Plaintiff,

V.

         Case No. 22 cv 1648 (VAB) (RAR)

FRANK PARLATO, JR.,

         Defendant.

---------------------------------------------------

NOV 21 2023 PM2:42
FILED-USDC-CT-NEW HAVEN

## **DEFENDANT FRANK PARLATO, JR.'S DECLARATION IN SUPPORT OF MOTION TO DISMISS**

The defendant *Pro se* Frank Parlato, Jr. ("Defendant" or "Mr. Parlato") declares under penalty of perjury and under 28 U.S. Code § 1746 and the laws of the United States of America that the foregoing is true and correct:

1.    I, Frank Parlato, Jr., respectfully contest plaintiff *Pro se* Christopher A. Ambrose's ("Plaintiff" or "Mr. Ambrose") improper, illegal, and unconstitutional assertion of jurisdiction over Defendant, disputes the sufficiency and propriety of the service of legal process in this matter, and moves this Honorable Court to strike, dismiss, or otherwise dispose of this matter pursuant to Rule 12 of the Federal Rules of Civil Procedure ("FRCP").

## **PRO SE LITIGANT**

2.    I am a *Pro se* litigant, unskilled in the science of law. In the interests of justice, I ask the Court to construe these pleadings of a pro se litigant in a lenient, liberal, and non-technical manner, raising the strongest arguments they suggest.

1

**ORAL ARGUMENT REQUESTED**

## THE FACTS

3.     I am a reporter, investigative journalist, and publisher of news.

4.     I was never served with the Complaint in this matter.

5.     I have several media outlets where I publish my reporting.  Relevant to this matter, those sites are The Frank Report (www.frankreport.com) and Art Voice (www.artvoice.com) (together the "Websites"), which are website-only media outlets.

6.     Neither I nor the Websites transact business in Connecticut.

7.     The Websites do not allow users to buy or sell anything.

8.     The only commodity that I offer is Free Speech: investigative journalism, newsgathering, and reporting.

9.     Users may comment on the releases or posts on the Websites.  Again, the Websites are Free Speech platforms.

10.    Neither I nor the Websites have contracts to be performed in Connecticut.

11.    Neither I nor the Websites solicit business in Connecticut or provide advertising specific to Connecticut.

12.    If I am liable for anything, it is for the dissemination of investigative journalism, newsgathering, and reporting into the free market of ideas – Constitutionally protected activity.

13.    I committed no tortious conduct in Connecticut. The Websites do not promote commercial activity beyond protected free speech.

14.    The Websites do not specifically target individuals in Connecticut or individuals who would be likely to view the website on a computer screen in Connecticut for commercial purposes.

15.    I have not directed his activities on the Websites so that they would be particularly reviewed or read by persons in Connecticut.

**ORAL ARGUMENT REQUESTED**

16.     I have not made any statements on the Websites that I believed would affect persons in Connecticut beyond the reporting of the news.

17.     I have not transmitted my allegedly harmful statements into the Connecticut jurisdiction using the mail or the wires of the United States or otherwise.

18.     I and the Website disseminate information to a general audience, which may be comprised of Connecticut readers as well as anyone else globally.

19.     The information objectionable to Mr. Ambrose attributable to me and the Websites is all posted on an Open Internet forum that could be viewed by anyone in the world.

20.     There is no allegation or proof that any of the posts allegedly written by me were directly and expressly targeted at Connecticut.

21.     Any emails to Mr. Ambrose were directly and expressly sent for legitimate journalistic purposes (i.e., requesting comment).  Mr. Ambrose does not allege that any of these news-gathering emails were tortious in nature.

22.     Mr. Ambrose's allegations in favor of personal jurisdiction are premised solely on my Websites' Internet postings, all of which were premised upon proper journalistic practices.

23.     I and the Websites have transmitted information about Mr. Ambrose on an Open Internet forum as part of our reporting activities.

24.     Neither I nor the Websites have specifically targeted Mr. Ambrose by threatening his life or safety.

25.     Neither I nor the Websites have specifically injected ourselves into Mr. Ambrose's "zone of privacy."

26.     Accordingly, I do not believe I should be subject to suit in Connecticut based on "tortious conduct in this state.." or any other provision of the long-arm statute.

3

**ORAL ARGUMENT REQUESTED**

27.    The only real claim that Mr. Ambrose has pleaded is defamation.

28.    Mr. Ambrose is a former Hollywood writer. He is well-known, particularly because of the abrupt circumstances surrounding his departure from Hollywood and allegations of plagiarism.

29.    Mr. Ambrose is the plaintiff in numerous cases and is a "serial" litigator.

30.    Mr. Ambrose is an attorney.

31.    Mr. Ambrose is a public figure.

32.    Assuming for the sake of argument that the defamation claim survives jurisdictional and due process analysis, Connecticut law requires a defamation action to be served by hand.

## IMPROPER AND INSUFFICIENT SERVICE

33.    I have not been appropriately served with valid or sufficient service under applicable law.

34.    I was never served with legal process validly subjecting me to the jurisdiction of the state or federal courts in the State of Connecticut courts.

35.    I state for the record that I never received or saw a copy of the initial pleading Plaintiff claims he "served" upon me. The plaintiff proffers no proof that I actually saw the initial pleading or that the same was delivered to me.

36.    I am a practicing journalist and a member of the media. I have been for the past thirty-five years.

37.    The plaintiff is suing me for publishing information and media in good faith, newsgathering, and publishing commentary and opinion on newsworthy subjects.

38.    The only plausible claim pleaded by Mr. Ambrose is a defamation claim.

4

**ORAL ARGUMENT REQUESTED**

39.     The plaintiff's complaint alleges three claims: 1) Invasion of Privacy by False Light at Common Law and the Second Restatement of Torts, 2) Defamation at Common Law and Connecticut General Statutes § 53-237, and 3) Intentional Infliction of Emotional Distress at Common Law.

40.     I ask the Court to look beyond the language used in the complaint and determine what the Plaintiff really seeks. I am confident the Court will see that the three claims asserted by Plaintiff are really one rambling, meandering, stream-of-consciousness, and legally defective defamation claim.

41.     I was never properly served with sufficient process because Plaintiff has failed to establish he can properly avail himself of the Connecticut Long Arm statute for what is, in substance, a defamation claim predicated upon my published words directed into the mass media and the public square.

42.     Connecticut's Long Arm statute specifically does not allow for non-personal service for defamation claims, and even if it did, such process would violate due process of law.

## NO JURISDICTION

43.     I assert there is no valid legal basis to invoke this Court's jurisdiction over me.

44.     I am a resident of the State of Florida.

45.     Jurisdiction does not lie in the State of Connecticut because I am a non-resident with no contacts to the jurisdiction.

46.     There is no connection between the State of Connecticut and the particular claims at issue in the Complaint.

47.     The speech occurred outside the jurisdiction and was not targeted at the jurisdiction or anyone in it.

48.     Connecticut's Long Arm specifically does not allow for jurisdiction for defamation claims.

**ORAL ARGUMENT REQUESTED**

49.  No general jurisdiction can be established over me in Connecticut.

50.  I am not present in Connecticut.

51.  I do not have business interests in Connecticut.

52.  I do not own property in Connecticut.

53.  I am not a party to contacts to be performed in whole or in substantial part in Connecticut.

54.  I do not solicit business in Connecticut.

55.  I do not conduct business in Connecticut.

56.  I do not avail myself of the laws of the Connecticut forum in any way.

57.  I am, and all journalists and media members similarly situated, would be prejudiced if the Connecticut District Court finds jurisdiction. Such a finding would not be consonant with due process and notions of fair play and substantial justice.

58.  Moreover, an assertion that jurisdiction exists here would allow an end-run around the Connecticut Legislature's clear pronouncement that defamation is explicitly not subject to long-arm jurisdiction.

59.  The chilling effects on free speech and the press would not be prejudicial only to me. Other journalists and the "Marketplace of Ideas" as a whole would suffer. Such an assertion of jurisdiction would be Constitutionally impermissible.

60.  Mr. Ambrose's claims that I am not a "real journalist" is a timeless losing argument that the First Amendment will not allow.

61.  Muck Rack is a digital platform designed to help public relations professionals, journalists, and other media personnel connect, collaborate and work more efficiently. It offers tools

6

**ORAL ARGUMENT REQUESTED**

for finding journalists, monitoring news, and organizing outreach. Muck Rack lists me as an investigative journalist. https://muckrack.com/frank-parlato.

- Google, the world's leading online search engine categorizes my writings as published in Artvoice, the Frank Report and the Niagara Falls Reporter [www.niagara fallsreporter.com] as "news" When Google approves a website as a news outlet, it means that the site's articles can appear under the Google News tab, offering a wider reach and visibility. Approval by Google News implies that the site is accurate, transparent, and trustworthy, adhering to Google's standards for news content. All of my websites have been approved by Google as News website. Being listed by Google as a news website involves meeting certain criteria, including but not limited to: regular updates with timely, original content, clear dates and bylines on articles, and adherence to journalistic standards such as accurate reporting and proper attribution of sources.

- Furthermore, I am known for publishing the Frank Report, Artvoice, and the Niagara Falls Reporter, according to my Wikipedia and Wikiwand profiles. I am recognized as an investigative journalist, as stated on my LinkedIn profile, my IMDb page, and the Frank Report website. My investigative work has been cited by numerous reputable news outlets, including The New York Times, The Daily Mail, VICE News, and CBS News. I played a crucial role in uncovering the truth about the NXIVM cult, as mentioned in Flim Daily article and consistent reporting on this and other topics further establishes my credentials as a journalist. I have written thousands of published articles. My work has been recognized and cited by hundreds of news outlets, which is a strong validation of my journalistic work.

- The impact of a journalist's work can also be a significant indicator of their role. In addition to my reporting on NXIVM, my work has resulted in significant changes which are well documented.

**ORAL ARGUMENT REQUESTED**

One of these is the opening up of the Maid of the Mist boat tour contract to public tender in Ontario Canada that led to a $300 million increase in revenue for the public on the life of the lease, directly attributable to a series of 80 stories I wrote and published on the no-bid nature of the most lucrative tourist contract in Niagara Falls. My reporting has influenced public opinion, initiated change, or brought important issues to light. To cite another instance, my newspaper the Niagara Falls Reporter did an investigative series that exposed corruption and led to Niagara Falls Mayor Vince Anello's federal indictment and conviction and term of incarceration on bribery charges.

62.     As pleaded, the four corners of the initial pleading, the Complaint, reveal, in substance, a singular claim that rings in defamation that is the only "plausible cause of action."

63.     The other two claims are re-cast defamation claims, one alleging an amorphous "privacy violation" caused by my words and the other alleging "emotional distress" caused by the same words, both of which are merely subspecies of alleged damages harms cognizable under the defamation claim.

64.     The plaintiff should not be rewarded for an inartful pleading attempting to disguise a defamation claim as another claim, thus circumventing an assertion of jurisdiction the Connecticut Legislature never intended to allow.

65.     Plaintiff has previously offered a Return of Service dated July 18, 2022, claiming that jurisdiction was acquired over me.  Said Return of Service was filed with the Clerk of the Superior Court in New Haven, Connecticut, on July 21, 2022.

66.     Plaintiff's purported method of service is inadequate. Filing with the Secretary of State of Connecticut followed by mailing is inadequate to confer jurisdiction in defamation matters.

67.     Moreover, I never actually received any purported process from Plaintiff or anyone else.

8

**ORAL ARGUMENT REQUESTED**

68.     Plaintiff has also failed to show I am *subject* to service. He has not proved that the Court may exercise personal jurisdiction over me or even alleged facts that would constitute a jurisdictional basis.

### MALICE AND ABSENCE OF GOOD FAITH ARE NECESSARY ELEMENTS THAT ARE NOT PLEADED AND THAT ARE NOT PLAUSIBLE

69.     This matter should be dismissed, or alternative relief granted as pleaded below and in the papers previously submitted to the Court because Plaintiff has not and cannot state a plausible claim against me.

70.     Included within the memorandum of law and as exhibits hereto are documents that show that my newsgathering and reporting was based on a good faith collection and communication of facts and the bonafide opinions of others that the press is entitled to rely upon and report on as a matter of law. These documents include:

    a.  Update on Ambrose Teens – Living with Mom's Cousin in NY as Ambrose Aims for Mother's Arrest in CT »

    b.  CT DCF Supervisor Michelle Peterson Ignores Allegations of Ambrose's 'Penetration' of Child – Puts It in Writing for Commissioner Dorantes »

    c.  Chris Ambrose Loses Motion to Bar Ex-Wife from Contacting Their Children

    d.  Police Threaten Teens With 'Rape and Beatings Daily' at Pleasantville Cottage School If They Don't Go Back to Ambrose

71.     Mr. Ambrose alleges a great many things. None of them are plausible. And none of what he claims rises to the level of a cause of action against a media entity

72.     This case should be dismissed because I was never served with legal process in this case, by hand or otherwise.

9

**ORAL ARGUMENT REQUESTED**

73.     The Court should strike the requested portions of the Complaint and dismiss the complaint for the reasons stated in the Memorandum of Law.

74.     The Court should grant the alternative relief requested if applicable.

### REQUEST FOR REASONABLE ACCOMMODATIONS

75.     I also ask that I may appear before the Court by Zoom and/or other videoconferencing means because I am a resident of the State of Florida, have no contacts in the State of Connecticut, and it would be an undue burden for me to appear in the State of Connecticut in person.

### INCORPORATION OF ALL PREVIOUS PAPERS BY REFERENCE

76.     I rely on the foregoing and my previous submissions to the Court, including my Notice of Removal, and my Opposition to Plaintiff's Motion to Remand, and all Exhibits attached thereto, and incorporate the entirety of the same by reference as if fully stated herein.

### REQUEST FOR RELIEF

Defendant Frank Parlato, Jr., moves this Honorable Court for an Order:

a)  Denying Plaintiff's Motion to Remand to the Connecticut Superior Court;

b)  Striking Counts 1 and 3 pursuant to Rule 12(f) of the Federal Rule of Civil Procedure (FRCP) as duplicative of Count 2; or

c)  Striking Counts 1 and 3 pursuant to FRCP Rule 12(f) as improperly plead, unsuccessful in law and fact, and prejudicial; and

d)  Dismissing this matter pursuant to FRCP Rule 12(b)(2); or in the alternative

e)  Dismissing this matter pursuant to FRCP Rule 12(b)(4); or in the alternative

f)  Dismissing this matter pursuant to FRCP Rule 12(b)(5); or in the alternative

g)  Dismissing this matter pursuant to FRCP Rule 12(b)(6); or in the alternative

10

**ORAL ARGUMENT REQUESTED**

h) Dismissing this matter pursuant to the doctrine of *Forum Non-Conveniens* or in the alternative

i) Transferring this matter to the United States District Court for the Southern District of Florida, Key West Division; and

j) For such other and further relief as this Honorable Court shall deem just and equitable.

Dated: Big Pine Key, Florida
      November 20, 2023

FRANK PARLATO, JR.

11

**ORAL ARGUMENT REQUESTED**

# EXHIBIT "A"



# Update on Ambrose Teens – Living with Mom's Cousin in NY as Ambrose Aims for Mother's Arrest in CT

🕐 October 6, 2023



*Chris Ambrose fought for the arrest of the mother of his children but failed so far....*



Frank Parlato

🕐 9:25 pm

💬 134 Comments



(f) (X) (◉) (in) (✉)

In the latest chapter of a high-profile custody dispute that garnered widespread media attention, the three Ambrose teens have found temporary respite with their mother's cousin in Rockland County, NY. In the meantime, Ambrose is seeking their forced return and their mother's arrest.



*M.A. S.A. and M.A on the run from their father.*

The battle centers around former Hollywood writer Christopher Ambrose, who is determined to force his children back to his home in Madison, CT, despite their strong preference to reside elsewhere.

The teens, previously placed under Ambrose's custody after a controversial court decision, have been seeking refuge away from him. They face an agonizing choice: return to their father or risk being separated and placed in violent juvenile homes.

The Ambrose case reveals the complexities of the family court system, drawing attention to its flaws and the lives it profoundly affects.

Ambrose, who lost his successful TV writing career following allegations of plagiarism, returned to their CT home and filed for divorce in 2019. His wife had previously taken him to California



### About the Author

Frank Parlato is an investigative journalist.

His work has been cited in hundreds of news outlets, like The New York Times, The Daily Mail, VICE News, CBS News, Fox News, New York Post, New York Daily News, Oxygen, Rolling Stone, People Magazine, The Sun, The Times of London, CBS Inside Edition, among many others in all five continents.

His work to expose and take down NXIVM is featured in books like "Captive" by Catherine Oxenberg, "Scarred" by Sarah Edmonson, "The Program" by Toni Natalie, and "NXIVM. La Secta Que Sedujo al Poder en México" by Juan Alberto Vasquez.

Parlato has been prominently featured on HBO's docuseries "The Vow" and was the lead investigator and coordinating producer for Investigation Discovery's "The Lost Women of NXIVM." Parlato was also credited in the Starz docuseries "Seduced" for saving 'slave' women from being branded and escaping the sex-slave cult known as DOS.

Additionally, Parlato's coverage of the group OneTaste, starting in 2018, helped spark an FBI investigation, which led to indictments of two of its leaders in 2023.

Parlato appeared on the Nancy Grace Show, Beyond the Headlines with Gretchen Carlson, Dr. Oz, American Greed, Dateline NBC, and NBC Nightly News with Lester Holt, where Parlato conducted the first-ever interview with Keith Raniere after his arrest. This was ironic, as many credit Parlato as one of the primary architects of his arrest and the cratering of the cult he founded.

Parlato is a consulting producer and appears in TNT's The Heiress and the Sex Cult, which premiered on May 22, 2022. Most recently, he consulted and appeared on Tubi's "Branded and Brainwashed; Inside NXIVM," which aired January, 2023.

IMDb — Frank Parlato

Contact Frank with tips or for help. Phone / Text: (305) 783-7083 Email: frankparlato@gmail.com

### Archives

Select Month ⌄

to their CT home and filed for divorce in 2019. His career had previously taken him to California and New York City, leaving the mother, Karen Riordan, as their children's primary caretaker for the first 13 years of their lives.

Riordan accused Ambrose of exerting financial control over their shared assets and stalking and harassing her during the divorce proceedings. Despite these allegations and the children's clear desire to live with their mother, Ambrose fought hard for custody and had all the money.

In 2019, Judge Eddie Rodriguez granted Riordan primary custody of their children, M., **M.A. and S.A.**, while Ambrose got visitation rights.

**Authors**

Frank Parlato

Janine Morrison

J.J. O'Hara

Richard Luthmann

Maria White

Paul Serran

- General
- Contact
- Privacy Policy
- Terms & Conditions



*GAL Jocelyn Hurwitz earned almost $200,000, paid by Ambrose. She agreed with Ambrose that Riordan alienated the children from their father's love.*

However, court-appointed Guardian Ad Litem (GAL) Jocelyn Hurwitz, funded by Ambrose, called an emergency hearing before another judge, Jane Grossman, alleging that Riordan was alienating the children from Ambrose. This claim was supported by custody evaluator Jessica Biren-Caverly, also paid by Ambrose.

Judge Grossman ordered the removal of the children from their home with Riordan and gave exclusive custody to Ambrose. She prohibited the mother from communicating with her children based on these claims of parental alienation.

After two years of living with their father without contact with their mother, Judge Gerard I. Adelman upheld this decision in 2022.



*In deciding to keep the teens and their mother apart, Judge Adelman emphasized the ambiguity of a Connecticut statute that requires courts to consider the "informed preferences of the child." Adelman indicated that "informed" is the operative word. That word enables judges to undermine the law. Depending on the testimony of the GAL, to whom the father reportedly paid almost $200,000, Adelman found the children's preference to be with their mother*

"uninformed."

A year later, the teens escaped from their father and returned to their mother in April 2023 – after three years with Ambrose.

But the determined father, backed by attorney Chris Goulden, sought to reverse this reunion. Ambrose attempted to have Riordan arrested, and the children returned to him, but these attempts were declined by both Judge Rodriguez and Judge Gladys Nieves.

Ambrose then went before Judge Thomas J. O'Neill, who had no family court experience. Over two days, Ambrose's new attorney, Alexander Cuda, argued that Riordan had coercively manipulated the children, employing Jennifer's Law, a statute enacted to protect victims of domestic violence in Connecticut. This strategic move insinuated that Riordan was exerting coercive control, a tactic often associated with psychological abuse.



*Former CT Bar Association's Family Law Section president, Alexander Cuda, filed for a restraining order against Riordan to prevent her from seeing their children. Despite the children's wishes to be with their mother, Cuda contended that their preferences were uninformed due to Riordan's alleged brainwashing of them not to want to be with their father.*

Despite the children's clear wishes to be with their mother, Judge O'Neill leaned on prior judgments and granted Ambrose restraining orders against Riordan on behalf of the teens, barring contact between the mother and her three teenage children for a year.

Judge O'Neill chose not to hear the children's allegations of abuse and neglect against Ambrose.

Rather than return to their father, M.A., M.A., and S.A. sought refuge in Rhode Island with their maternal grandfather. Ambrose went to Rhode Island and threatened to get a court order for the arrest of his children.

In Connecticut, Judge O'Neill held the mother in contempt and threatened Riordan with five years' imprisonment if she communicated with her children.

Without their mother's help and fearing arrest, the teens took refuge with a family friend in Westchester County, New York.



The situation was dramatic when Ambrose appeared at the refuge with Mount Pleasant police and Child Protective Services (CPS). The teens refused to return to their father, and after a four-

hour standoff, police left, but a CPS worker promised they would be back with a court order to arrest the teens. The children fled that night after being told they would be placed in juvenile homes where they would face daily rape and beatings.

Pleasantville NY Police come with Ambrose Threaten Teens

The following day, Ambrose escalated the situation further when the FBI and state police, acting on tips from Ambrose, performed a SWAT raid on a home Riordan was visiting.

The raid, however, found the teens were not present. Fortunately, no one was injured.



*Ambrose weaved a yarn of a dangerous mother worthy of one of his Law-and-Order scripts. The FBI disappointed him when they informed him that the kids were not there, and the mother was not arrested.*

The children had fled to their mother's cousin in Rockland County. The cousin, a respected figure in his town, allowed Ambrose to visit the teens but refused to force them to return with him absent a court order. Despite the cousin's offer to ensure the children's safety and schooling, Ambrose threatened to get a court order in New York State, forcing the teens to return with him or face placement in separate juvenile homes.



*Ambrose sought to have the kids go home with him or have the court place them in the Pleasantville Cottage School – a juvenile home for troubled youth. He declined to let them live with family or friends.*

Meanwhile, Ambrose sought another judge in CT, Erika Tindall, to hear his latest motions to arrest Riordan for violating her conference and force the children back to his home.

*Judge Erika M. Tindall CT Court*

This case has drawn significant attention due to its implications for future family court proceedings. It highlights the controversial use of Jennifer's Law and the principle of DARVO (Deny, Attack, Reverse Victim and Offender).

The situation remains tense, with the children caught in this contentious dispute. Judge Tindall is expected to hold a hearing next week on Ambrose's demand to arrest the mother, telling the judge that the teens are brainwashed by their mother and that his love for them is boundless.

He has filed a motion with Judge Tindall where he seeks:

# Arrest Riordan

**Riordan's imprisonment: Ambrose** wrote, "Incarceration has never been the plaintiff's goal, but all remedies – including monetary sanctions and mandated therapy – haven't stopped her... Unless she is held accountable, her contempt will continue, further harming the children who have yet to attend school as they have been secretly moved from state to state, to stay with the defendant's friends and relatives."

## No Motions Without Preapproval

Ambrose seeks that Riordan "not be allowed to file any motion until she files a request for leave to file same and the Presiding Judge approves the motion."

## Take Away Kids' Cellphones

Ambrose wants Judge Tindall to order Riordan "to cancel the children's phone plans" within two days and force them to use iPhones he provides the teens. In this way he can monitor their texts



*Karen Riordan*

## Gag Mother

Ambrose wants Judge Tindal to order Riordan not to share "with any third party or entity, including but not limited to frankreport.com, familycourtcircus.com, and @therobbieharvey on tiktok.com, any information/narratives/photos/recordings about, by, or referencing the children."

# Force Info off of Frank Report and Robbie Harvey

Ambrose seeks Judge Tindall to order Riordan demand via email within two days of the order that @therobbieharvey on tiktok.com and frankreport.com, "a website published by her boyfriend, Frank Parlato, Jr., immediately remove the hundreds of photographs, records, audio/video clips of, and any references to the children."

# Force Riordan to Tell the Teens to Go Back to Ambrose

Ambrose wants Judge Tindall to order Riordan to inform the children that she wants them to return to Ambrose.

"The defendant shall comply with these directions within two days of the order," Ambrose wrote.

## Riordan Pay His Costs

Ambrose wants Riordan to pay the "costs incurred in preparing and prosecuting these contempt motions, including attorney and marshal fees and subpoena costs.

Ambrose, who took all the marital money and more than $150,000 of her inheritance, wants Judge Tindal to order Riordan to pay him $2,000 within ten days.

*Editor's Note: Many of the claims Ambrose makes in his motion are false. In a future post we will try to show how many falsehoods Ambrose has made.*

 ank Parlato

**Share this:**

🐦 Twitter   📘 Facebook   📰 Reddit   ✉ Email



the au                                                        VIEW ALL POSTS

### Frank Parlato

*Click here to post a comment*

---



**The children must be permitted to speak**
October 9, 2023 at 10:26 am

psy-cho-path: a person having an egocentric and antisocial personality marked by a lack of remorse for one's actions, an absence of empathy for others, and often criminal tendencies.

The courts need to permit the children to speak freely and on the record. Why have their voices been silenced at every turn? They have each stated categorically that they do not want to be with Chris Ambrose, that they fear Chris Ambrose, that they reject Chris Ambrose.

Who would persist in this lunacy given those facts? A psychopath, that's who.

REPLY

---



**Impeach Gerard Adelman.**
October 8, 2023 at 7:19 pm

. Our constitution allows the removal of judges by impeachment. It also authorizes the Governor to remove them on the vote of two-thirds of each House, and the Supreme Court to remove them as provided by law (Art. 5, § 2 of the Conn. Const. As amended by Art. 20).

The Constitution gives the House of Representatives the sole power to impeach a judge (Art. § 1 Conn. Const.). All impeachments must be tried by the Senate. No judge may be impeached without the concurrence of at least two-thirds of the members present. An impeachment judgment results in removal from office and disqualification to hold any other state office (Art. 9, § 1-3 Conn. Const.). ...

https://www.cga.ct.gov/PS97/rpt/olr/htm/97-R-1424.htm

REPLY

**EXHIBIT "B"**



**FR** Frank Report

# CT DCF Supervisor Michelle Peterson Ignores Allegations of Ambrose's 'Penetration' of Child – Puts It in Writing for Commissioner Dorantes

September 30, 2023

**About the Author**

Frank Parlato is an investigative journalist.

His work has been cited in hundreds of news outlets, like The New York Times, The Daily Mail, VICE News, CBS News, Fox News, New York Post, New York Daily News, Oxygen, Rolling Stone, People Magazine, The Sun, The Times of London, CBS Inside Edition, among many others in all five continents.

His work to expose and take down NXIVM is featured in books like "Captive" by Catherine Oxenberg, "Scarred" by Sarah Edmonson, "The Program" by Toni Natalie, and "NXIVM. La Secta Que Sedujo al Poder en México" by Juan Alberto Vasquez.

Parlato has been prominently featured on HBO's docuseries "The Vow" and was the lead investigator and coordinating producer for Investigation Discovery's "The Lost Women of NXIVM." Parlato was also credited in the Starz docuseries "Seduced" for saving 'slave' women from being branded and escaping the sex-slave cult known as DOS.

Additionally, Parlato's coverage of the group OneTaste, starting in 2018, helped spark an FBI investigation, which led to indictments of two of its leaders in 2023.

Parlato appeared on the Nancy Grace Show, Beyond the Headlines with Gretchen Carlson, Dr. Oz, American Greed, Dateline NBC, and NBC Nightly News with Lester Holt, where Parlato conducted the first-ever interview with Keith Raniere after his arrest. This was ironic, as many credit Parlato as one of the primary architects of his arrest and the cratering of the cult he founded.

Parlato is a consulting producer and appears in TNT's The Heiress and the Sex Cult, which premiered on May 22, 2022. Most recently, he consulted and appeared on Tubi's "Branded and Brainwashed: Inside NXIVM," which aired January, 2023.

IMDb — Frank Parlato

Contact Frank with tips or for help.
Phone / Text: (305) 783-7083
Email: frankparlato@gmail.com



*Chris Ambrose fought for the arrest of the mother of his children but failed so far....*


Richard Luthmann
🐦 rjluthmann


12:26 am


39 Comments

(f) (X) (🐦) (in) (✉)

## By Richard Luthmann

While Christopher Ambrose used the courts to force his children to live with him,  M.A. 6, filed a petition in the Juvenile Division of the CT Superior Court to protect herself from Ambrose.


M.A.

In her petition were abuse allegations, including allegations of molestation perpetrated by Ambrose against his children.

The Juvenile court appointed Mia an attorney- Michael G. Curley of Mutha Cullina, LLP. In investigating the matter, Curley emailed Nancy Stewart, Kelly Burke, and Michelle Peterson of CT DCF about allegations against Ambrose on June 6, 2023.

**From:** Michael G. Curley <mcurley@murthalaw.com>

**Archives**

Select Month ⌄

**Sent:** Tuesday, June 6, 2023 2:43 PM
**To:** STEWART, NANCY <NANCY.STEWART@ct.gov>
**Cc:** BURKE, KELLY <KELLY.BURKE@ct.gov>; PETERSON, MICHELLE <MICHELLE.PETERSON@ct.gov>
**Subject:** Re: [EXTERNAL] RE: Appointment to interview N   Ambrose

You don't often get email from mcurley@murthalaw.com. Learn why this is important

EXTERNAL EMAIL: This email originated from outside of the organization. Do not click any links or open any attachments unless you trust the sender and know the content is safe.

Good afternoon, Nancy:

I have not gotten confirmation from my client (or her mother) that they are willing to meet at this time.

When we spoke previously, you indicated that the most recent report included allegations against  father, including a new allegation of penetration. This is the first time I have learned that there are allegations in the most recent report regarding the safety of the children in their mother's home. Is that correct? Or did I misunderstand your email below?

Could you please provide a copy of the most recent report? Or a summary of the allegations?

Thank you,

MICHAEL G. CURLEY | ASSOCIATE

Direct: 860-240-6049 | Fax: 860-240-5869 | mcurley@murthalaw.com

|MURTHACULLINA

Murtha Cullina LLP | Attorneys at Law | www.murthalaw.com

280 Trumbull Street | Hartford | CT | 06103-3202

> Good afternoon, Nancy:
>> I have not gotten confirmation from my client (or her mother) that they are willing to meet at this time.
>
>> When we spoke previously, you indicated that the most recent report included allegations against Mia's father, including a new allegation of penetration. This is the first time I have learned that there are allegations in the most recent report regarding the safety of the children in their mother's home. Is that correct? Or did I misunderstand your email below?
>
>> Could you please provide a copy of the most recent report? Or a summary of the allegations?
>
>> Thank you,
>
>> MICHAEL G. CURLEY

Curley's request was reasonable: "Could you please provide a copy of the most recent report? Or a summary of the allegations?"

The response from the CT DCF Program Supervisor Michelle Peterson is where things get strange:

**From:** PETERSON, MICHELLE <MICHELLE.PETERSON@ct.gov>
**Sent:** Tuesday, June 6, 2023 3:28 PM
**To:** Michael G. Curley <mcurley@murthalaw.com>; STEWART, NANCY <NANCY.STEWART@ct.gov>
**Cc:** BURKE, KELLY <KELLY.BURKE@ct.gov>
**Subject:** RE: [EXTERNAL] RE: Appointment to interview N   Ambrose

Good afternoon Attorney Curley,

As Nancy states below, we have been unable to schedule a time to meet with M   and M     in their mother's home. This is necessary in order to assess their safety given that they are now residing with their mother. Per our own policy, we must continue to make attempts to see the children, mother, and her home.

We have an active assessment related to allegations against both parents. We have

**Authors**

Frank Parlato 

Janine Morrison

J.J. O'Hara 

Richard Luthmann

Marie White 

Paul Serran 

- General
- Contact
- Privacy Policy
- Terms & Conditions

received several reports - some of which were not accepted because of duplicate information. Our most recent report is related to the children in mother's care and allegations that they are not attending school, have missed appointments with providers, and are not taking medication as needed. Another recent report raised general concerns about the children in mother's care given there is a court order in effect that says she is only to have supervised contact. These are all allegations that must be addressed with mother and her children, however we have not been given access to her household thus far.

We would greatly appreciate it if you could arrange a time for us to meet with your client. Mia, and her mother this week. While we also want to meet with Mia's brother Matthew, I understand that he is not your client. We would like to be able to schedule a time that is mutually agreeable, but frankly our timeframe for doing so has long since passed. We would appreciate it if you could help bring people to the table.

Thank you,

Michelle Peterson

**Michelle Peterson MSW**

Program Supervisor DCF

2661 G Main Street

**Middletown CT 06457**

Office (860) 636-3123

Cell (860) 836-1871

Good afternoon Attorney Curley,

> As Nancy states below, we have been unable to schedule a time to meet with M    and M       in their mother's home. This is necessary in order to assess their safety given that they are now residing with their mother. Per our own policy, we must continue to make attempts to see the children, mother, and her home.

> We have an active assessment related to allegations against both parents. We have received several reports – some of which were not accepted because of duplicate information. Our most recent report is related to the children in mother's care and allegations that they are not attending school, have missed appointments with providers, and are not taking medication as needed.

> Another recent report raised general concerns about the children in mother's care given there is a court order in effect that says she is only to have supervised contact.

> These are all allegations that must be addressed with mother and her children, however we have not been given access to her household thus far.

> We would greatly appreciate it if you could arrange a time for us to meet with your client, M    and her mother this week. While we also want to meet with M  s brother M      . I understand that he is not your client. We would like to be able to schedule a time that is mutually agreeable, but frankly our timeframe for doing so has long since passed. We would appreciate it if you could help bring people to the table.

> Thank you,

> Michelle Peterson

Let's break this down.

Attorney Curley makes a specific request: "Could you please provide a copy of the most recent report [of sexual penetration]? Or a summary of the allegations?"

DCF Program Supervisor Michelle Peterson evades addressing the report of sexual penetration.

There is no further mention of the sexual penetration allegations. She does not deny they exist, and she does not agree to provide them.

She says: "We have an active assessment related to allegations against both parents."

In plain English, that means Mia Ambrose complained about sexual penetration by Ambrose.

But there were also complaints against Riordan. What are these complaints?

- **The Ambrose children are not attending school.** [When this exchange occurred, June 6, 2023, it was at the end of the school year, and M ▇M.A. M.A. and S.A▇ were in Riordan's care. ▇M.A. and M▇ were attending school with greater regularity than with Ambrose. ▇M.▇ missed only three school days when her father was stalking her. But when she lived with Ambrose, she had 17 unexcused absences. ▇M.A.▇'s return to his mother was a triumph for his schooling. After he left Ambrose and began to live with his mother, his depression lifted, and he began attending full days of school for the first time since October 2022. While in Ambrose's care, ▇M.A.▇ had 50 unexcused absences, and because of his depression, he only attended half days when he went to school. DCF failed to find educational or emotional neglect against Ambrose but instead targeted Riordan.

- **The Ambrose children missed appointments with providers.** [They felt they no longer needed the endless rounds of therapy sessions for depression and trauma because they were forced to live with a man, they said, who abused them. However, ▇M.A.▇ saw his ICAPS counselors in his mother's home for 14 weeks, and ICAPS reported ▇M.A.▇ was a new person. Of course, once his father got a restraining order ▇M.A.▇ and his siblings were homeless.]

- **The Ambrose children are not taking medication as needed.** [The teens did not need the anti-depression medications now that they were not forced to live with their father and could live with their mother.]

Who complained about Karen Riordan? You guessed it: Christopher Ambrose.

And the next part is the kicker. What about the sexual penetration allegations?

**"We have received several reports – some of which were not accepted because of duplicate information."**

DCF Program Supervisor Peterson stated in writing that it is the policy of the Connecticut Department of Children and Families to not accept multiple reports of sexual penetration because of "duplicative information."

Let me say that again.

DCF Program Supervisor Michelle Peterson confirmed that DCF would "sometimes" decline to investigate multiple credible allegations that a parent is raping or sexually abusing a child.

But DCF *will* investigate truancy, missed doctors' appointments, and medication compliance.

DCF gives no reasons or stated policy standards for why some reports are accepted and others are not. This is the textbook definition of unreasonable. It is arbitrary and capricious, and the CT Superior Court should ask 'Why?'

Was Mia dressed in a purple shirt, and is it DCF policy not to take seriously multiple, specified, and particularized sexual penetration complaints from minors in purple shirts?

Or is it because Mia is brown-skinned and adopted, and her father is white? Is it DCF policy not to accept multiple, specified, and particularized sexual penetration complaints from minors who are black and brown when the alleged perpetrator is white?



DCF Commissioner Vannesa DoranteDCF Commissioner Vannesa Dorantes said of former DCF employee, brown-skinned, Hispanic, Eliezer Rios, 40, who sexted with a 15-year-old girl but never touched her, "No child or youth should be subjected to or victimized by this type of behavior."

On the other hand, allegations of sexual penetration by wealthy Chris Ambrose, white as an Albino, by his adopted brown-skinned teen are ignored by her supervisor, Peterson.

Commissioner Dorante saw to it that Rijos was fired on the spot, the girl was interviewed and offered therapy, an investigation was made in the DCF to make sure Rijos sexted no one else — and DCF referred his conduct to the police, where he was arrested.



Rijos sexted a girl. He was arrested.



*Chris Ambrose allegedly did a lot more than sexting, but DCF chooses to ignore it.*

In the meantime, DCF is fighting to get the Ambrose kids back from NY to CT to place them in the hands of Ambrose.

Suppose DCF investigated Ambrose as they did the lowly Rijos. In that case, it might divert the cash flow Ambrose pays family law attorney Alex Cuda and possibly divert it for a less deserving criminal defense attorney.

On Dorante's watch, an affluent abuser can get the wholesale endorsement of DCF about how wonderful he is.


Richard Luthmann

Share this:

🐦 Twitter   📘 Faceboo·   📷 Reddit   ✉ Email



the au·   ⅋ f 🜨 in ⊗ ▲ t 🐦                    VIEW ALL POSTS

Richard Luthmann

Click here to post a comment

**EXHIBIT "C"**



**D   Frank Report**

Frank Report    The Lost Women of Nxivm    Comments on Frank    Appearances    Media Credits    Book Mentions    Select Media Mentions    Authors    Contact

# Chris Ambrose Loses Motion to Bar Ex-Wife from Contacting Their Children





**Frank Parlato**

🕐 1:54 am

💬 256 Comments

## Court Denies Ambrose's Attempt to Blame Frank Report for Children's Emotional Distress

Chris Ambrose lost his first battle in court in his four-year divorce and custody battle with his ex-wife Karen Riordan. The fight was over marital assets and custody of their three children.

Ambrose got all the marital assets and full custody of the children in a final decision in 2022.

Last week, Ambrose lost a motion for a protective order. He sought to bar his wife from coming within a mile of the children's school or home.

Before the divorce, Ambrose was an absentee father for much of his children's young lives until, in 2018, he lost his Hollywood writing career because of allegations of plagiarism.

His implosion came when he "wrote" an episode for the TV show *Bones*. After "*Secrets and Lies*" aired, viewers revealed, and the media reported, that it was an outright theft of the plot of an eight-year-old episode of another TV show, *Instinct*, from an episode called "*The Plain and the Prodigy*."

Quartz wrote  An unspeakable crime has been committed in the world of TV police procedurals

The Wrap wrote a story entitled, CBS crime drama has been accused of ripping off long-running Fox procedural

### About the Author

Frank Parlato is an investigative journalist.

His work has been cited in hundreds of news outlets, like The New York Times, The Daily Mail, VICE News, CBS News, Fox News, New York Post, New York Daily News, Oxygen, Rolling Stone, People Magazine, The Sun, The Times of London, CBS Inside Edition, among many others in all five continents.

His work to expose and take down NXIVM is featured in books like "Captive" by Catherine Oxenberg, "Scarred" by Sarah Edmonson, "The Program" by Toni Natalie, and "NXIVM. La Secta Que Sedujo al Poder en México" by Juan Alberto Vasquez.

Parlato has been prominently featured on HBO's docuseries "The Vow" and was the lead investigator and coordinating producer for Investigation Discovery's "The Lost Women of NXIVM." Parlato was also credited in the Starz docuseries "Seduced" for saving 'slave' women from being branded and escaping the sex-slave cult known as DOS.

Additionally, Parlato's coverage of the group OneTaste, starting in 2018, helped spark an FBI investigation, which led to indictments of two of its leaders in 2023.

Parlato appeared on the Nancy Grace Show, Beyond the Headlines with Gretchen Carlson, Dr. Oz, American Greed, Dateline NBC, and NBC Nightly News with Lester Holt, where Parlato conducted the first-ever interview with Keith Raniere after his arrest. This was ironic, as many credit Parlato as one of the primary architects of his arrest and the cratering of the cult he founded.

Parlato is a consulting producer and appears in TNT's The Heiress and the Sex Cult, which premiered on May 22, 2022. Most recently, he consulted and appeared on Tubi's "Branded and Brainwashed: Inside NXIVM," which aired January, 2023.

IMDb — Frank Parlato

Contact Frank with tips or for help.
Phone / Text: (305) 783-7083
Email: frankparlato@gmail.com

**Archives**

Select Month

CinemaBlend wrote a story entitled CBS' Instinct Accused Of Ripping Off Plotline From Fox's Bones

*TV Guide reported, The Video Evidence That Instinct Ripped Off Bones Is Damning*









**Authors**

Frank Parlato

Janine Morrison

O'Hara

Richard Luthmann

Merle White

Paul Serran

› General

› Contact

› Privacy Policy

› Terms & Conditions

On April 3, two days after *Secrets and Lies* aired, *Plagiarism Today* wrote Did Instinct Plagiarize Bones?

The dialogue and plot were the same, an Amish piano player who ran away from the farm and was killed in the big city. Even the props and dialogue were the same, such as the murder investigators' comments about a "nice quilt" and that if they were teenagers, they "would wanna run away from" the Amish parents' home.

And Hollywood ran away from Ambrose. Fired from his lucrative Hollywood work, Ambrose came home to Connecticut and soon filed for divorce, but not before locking his wife out of their joint bank accounts and taking her inheritance – something he admitted in court testimony.



*Chris Ambrose*

Ambrose, is also a lawyer. He called his children's less than enthusiastic attitude about being with him "parental alienation," which he said was caused by his wife.

He paid various "experts" to back up the theory. He claimed the children's preference for their mother, their primary attachment figure all their lives, was not because of his behavior, but because their mother put them up to it.



*Judge Jane Grossman often finds parental alienation occurs when stay-at-home mothers allege an affluent father is abusive*

The children disputed it, but CT Family Court Judge Jane Grossman never allowed them to speak. Instead, she flipped custody, taking three happy children out of their home with their mother and forcing them to live with their father based on a custody evaluation report paid for by Ambrose, and the testimony of the guardian ad litem, also paid by Ambrose because he had sole access to marital funds.

It did not hurt Ambrose's chances of winning based on his selection of his attorney Nancy Aldrich.



At the time, Judge Grossman was due for reappointment to retain her judgeship. Based on parents' horror stories that she flipped custody to the highest bidder, it looked like it would be a contentious hearing. Her friend, Judge Jane Emons, was booted off the bench when the state legislature's Judicial committee failed to fight for her reappointment.

Ambrose's attorney, Nancy Aldrich's son, Will Haskell, was a state senator and significantly on the judicial reappointment committee.

Much against their wishes, the children were suddenly removed from the only home they had ever known – with their mother – and forced to live with their father, which was a traumatizing event for them.

Judge Grossman went further. A staunch adherent of parental alienation, she barred all contact betwe



*Judge Gerard Adelman*

Finally, another judge, Gerard Adelman, made Grossman's orders final. Adelman was the leading adherent of parental alienation in Connecticut before becoming a judge. He is a man who made his career flipping custody to fathers as a guardian ad litem. He used parental alienation to hand children to fathers accused of sexual molestation based on nothing more than his word as a GAL, bolstered by a report by a custody evaluator he hand-selected, guided and paid for by the father.

The custody evaluator invariably found the same thing every time: The children were lying, the mother coached them, and the father did not sexually abuse the children.

Contradictory expert opinion, even from noted psychiatrists or pediatricians, was always ruled inadmissible or not credible.

When he became judge, Adelman continued to show his bias against mothers and his belief in parental alienation.

Adelman stands today as one of the leading adherents in CT to the concepts taught by the late Dr. Richard Gardner, who taught that alienation from a father is worse for a child than sexual molestation by the same father.

As shocking as it may sound to people outside Connecticut, this is settled practice. Though it is not written law, it is better than law. It is how CT family courts practice when fathers are affluent, or court actors can access father's rights funds.

Judge Adelman dissolved the Ambrose-Riordan marriage and handed every dime of more than $2 million of joint marital assets to Ambrose, plus Riordan's inheritance. He awarded Ambrose complete and exclusive custody of the children, despite the children's repeated calls to live with their mother.

Adelman ascribed the children's desire to live with their mother to parental alienation.

Though separated for three years, the children continue to wish to live with their mother. It is unsurprising, since they lived with their mother and had continuous contact with her and her extended family and friends their entire lives until the parental alienation judges lowered the boom on their happiness.

They are now forbidden to see their mother and grandparents, aunts, uncles, cousins, and friends.

It did not concern Judge Adelman that Ambrose has no close family and no friends he would ever care to bring home to meet the children.

One day the children had a mother and a life with many who loved them. The next day, the court placed them with their father, who forbade contact with their lifelong friends, family, and primary attachment figure, their mother.

The children's cries were not without substantiation. According to DCF records, Ambrose was an unsafe and abusive father. The children alleged he sexually, physically, and emotionally abused them.

It cost Ambrose about $1 million in lawyers, custody evaluators, therapists, and the guardian ad litem to thwart the children's cries to see their mother. The cost was about the same as what he would have had to give his wife out of their marital funds had he appeared before a court that followed state's law and required Ambrose to file financial affidavits and enforced the laws of marital property.

Still, Ambrose lost in court last week. Though he has physical custody of the children – at their ages — 16, 16 and 12, Ambrose, 60, has increasing difficulty preventing them from going out the door and seeing their mother who lives nearby.

The motion for a protective order arose because she watched a high school sports game of one of the children and spoke with her daughter. Ambrose' found out and his punishment of his daughter was not enough to deter the teenager from a vow to never see her mother again.

Ambrose seems to have realized that his daughter, at 16, was becoming like many teens can be not completely compliant. The old tricks he used in the past to threaten the child with arrest or take away her every possession were not as effective as before.

So Ambrose filed a motion with the court to bar the mother from coming within a mile of the children's home or school. That would keep them apart and if the mother violated the order he would have her arrested.

He lost in court after Judge Eddie Rodriguez heard four days of evidence and ruled against Ambrose.

Strangely, much of the four days' hearings were about how Frank Report's stories hurt him and his children.

His parental alienation theory won him the right to closet his children away from the world and bar contact with everyone they knew and loved. He blamed their mother, whom he said coached the children. It was not his own behavior that alienated them, he said.

His latest theory was that it was not his own behavior [in taking their mother out of is children's lives] that made the children depressed. It was Frank Report stories.

In court, Ambrose told a fanciful story about an incident at the Guilford fairgrounds, where a group of teens surrounded his daughter and began chanting "Frank Report." Ambrose described the ensuing fight somewhat like an Antifa riot – all because of stories in the Frank Report.

Riordan, however. had the video which did not show any children chanting or even mentioniking Frank Report. The fight was a minor teenage catfight with a little pushing and shoving, a bit of scratching, some name-calling, lasting a few seconds.

Riordan told the court the melee had nothing to do with kids reading the Frank Report, a website they likely never even heard of.

Riordan asked Ambrose to produce a police report since the described riot must have brought police to the scene where witnesses would have told police about children taunting a child with a repetitive chant of "Frank Report."

Ambrose could not produce a police report.

Ambrose testified Frank Report caused another of his children to absent himself from school.

Riordan had the police reports.

Ambrose tried to get the Madison police to force the child out of his room and to school. The police reports show Ambrose told the police nothing about Frank Report. Instead, he told the police that his child was not going to school because he was depressed about his poor relationship with his mother. His ex-wife, Ambrose said, lives far away and does not even bother to see her child. He failed to tell police that he won custody and forbade the children

from seeing their mother, which is why the boy is depressed.

Another almost comical moment was when Ambrose spoke with literal tears in his eyes [he broke down and sobbed numerous times during the hearings] and asked the court to imagine his horror when he tried to shield the children from the website stories about him.

Still, they found the stories online and felt crushed.

But Riordan had audio of him telling his children, who knew nothing about website stories, to read the stories online, even directing them to the website URLs.

[You may wonder how Riordan had many audios and videos of Ambrose abusing the children. It is because the children took to recording him secretly. They argue that their father always lies and that no one will believe how abusive he is unless they have proof. Suppose you have any kind of judge other than an Adelman or Grossman. In that case, whether you think the children are wrong to record their father, it says volumes about their unhappy home. It is also noteworthy that Ambrose secretly recorded the children before the children recorded their father. It speaks to the distrust and inharmony in that unhappy, and lonesome home.]

When Riordan testified, Ambrose tried to put words in her mouth: the Frank Report stories caused the children enormous emotional distress, right Karen?

Riordan denied it. She said Ambrose's cruel behavior caused them distress, mainly because they couldn't see their mother, whom they had lived with all their lives.

Ambrose testified that one of the children endured brutal ridicule from classmates who saw Frank Report stories. He said she emailed her mother asking for a story to be taken down, but the article remained.

Riordan pointed out the email came from Ambrose's email account, not from her daughter.

Ambrose defended that by saying his then-15-year-old daughter had to use his email account because none of the children have their own email.

Riordan countered that almost all teenagers have email accounts. It is odd that he would not allow the children to have communications with the outside world.

On further questioning, Ambrose admitted he forced the children to cancel their Instagram accounts. Why? Because the same children who supposedly are so hurt by the publicity about their case were posting stories about the pain of losing their mother and the lies their father told about them.



Ambrose testified that Frank Report posted an "open letter" to one of their sons on his 15th birthday, saying it was hurtful.

"That was quite a memorable birthday for him," Ambrose explained later, condemning Frank Report writing about the motherless boy.

Ironically, Ambrose submitted as evidence a Frank Report story about another memorable birthday, the boy's 12th.

What made it memorable was that Ambrose came home and asked his son to open the door to

let him in the house, and the boy's dog, Cody, ran out. The boy tried to chase after the dog, but Ambrose ordered the boy back into the house.

Ambrose seems to have never liked the dog, and often joked about the dog meeting with an unfortunate death, like being impaled or hit by a car. When the children objected to these comments, Ambrose said he was only joking.



Cody met an unpleasant end after Chris Ambrose said the dog loved peanut butter.

Shortly after the dog ran out the door, a neighbor called and said Cody showed up on her porch, and offered to bring the dog home.

Ambrose declined, saying Cody loved peanut butter and would come home for a plate of the salty treat he placed outside the door.

Ambrose's statement puzzled the children, for Cody did not eat peanut butter; and Ambrose did not put a plate outside the door.

Because he turned down the neighbor's offer, the neighbor let the dog run off the porch expecting he would go home to get his peanut butter. The dog ran onto the busy road, and was struck and killed by a car.

The following day, the boy's birthday was made somber by the loss of the dog and the recognition that their father lied about the peanut butter. It was made worse when Ambrose repeatedly told his sorrowful son that he was to blame for the dog's death because he had left the door open a few seconds too long. As a result, the boy not only endured the loss of his beloved dog on his birthday, but was also gaslit by his father into a blame-shifting tactic that he, not Ambrose, was responsible for the dog's death.

I heard audios of the children questioning Ambrose about lying about the peanut butter, and his nonchalant attitude and blame shifting on that is a marvel to behold.

Yes, it was a memorable birthday for the boy.

In the same vein, Ambrose told his stories for four days, but Judge Eddie Rodriguez didn't buy that Frank Report was the culprit or that the mother was dangerous to her children.

He denied Ambrose's motion to prevent the children from seeing their mother.

Within 45 minutes of losing in court, Chris Ambrose emailed me claiming he and the mother, Karen Riordan, agreed they wanted me to take down my stories.

**Chris Ambrose:**
Ambrose wrote me an email entitled: Re:*United Parental Demand to Stop Invading Our Children's Privacy and Causing Emotional Distress*
"Mr. Parlato:

"From October 3, 2021 through the present, you have published at least 74 articles and well over a thousand reader "comments" that discuss our three minor children on your websites, . Your articles repeatedly publicly identify our children – with dozens of photos – as victims of sexual and emotional abuse (by Ambrose), a violation of privacy even adult victims of such alleged crimes are spared..... This unconscionable invasion of privacy not only exposes them to information they are too young to see, it also subjects them to intense public scrutiny, stinging ridicule, and humiliation. In short, you are causing them extreme emotional distress that impacts their daily lives.

"To protect our children, Karen and I demand that you immediately remove every photo, record, article, and comment referencing them in any way from your websites and that you refrain from publicizing anything about them anywhere in the future....

"We demand you stop tormenting them, immediately....

"This is far from the first time you have been made aware of the severe damage your publications cause our children, but it's the first time Karen is joining me in insisting that you stop bullying them in print and leave them alone....

"Therefore, both Karen and I demand that you immediately take down every photo of and any reference to them in your articles and do not publicize anything about them on any platform in the future....

"It is expected that your regard for Karen will lead you to accede to her request to end your obsessive torment of our children without delay."



Frank Parlato

I wrote to Riordan, copying Ambrose, to ask if this was a joint request of her and his. I did refer to Ambrose's history as a plagiarist.

To: Chris Ambrose and Karen Riordan

"Ms. Riordan

"I received the preposterous email below from Christopher Ambrose [who I copied on this].

"He states his email is a 'United Parental Demand to Stop Invading Our Children's Privacy and Causing Emotional Distress.'

"He writes he claims for both you and him. Maybe it is just my instinct, but I feel in my bones he is lying again.

"For instance, he writes: 'To protect our children, Karen and I demand that you immediately remove every photo, record, article, etc...'

"And again, he writes, 'It is expected that your regard for Karen will lead you to accede to her request to end your obsessive torment of our children without delay.'

"I am not aware, Karen, that you need Chris to make your requests for you.

"I am convinced that the children's tormenter is the man writing the email to me. The fact that my truthful reports have tormented Chris since they exposed his Secrets and Lies, is not my problem.

"Karen, for the record, are you joining Chris in this demand, or is he just being a Pain in the Prodigy again with his incessant lying?

"Frank

"PS Good try Chris or as the Investigative Reporter said, 'If I was a teenager, I'd wanna get out of [y]our house too. Nice curb though.'"



*Karen Riordan*

Karen Riordan responded, emailing me and copying Ambrose:

"Dear Mr. Parlato,

"You are correct. I did not know about nor did I approve the email sent by Chris Ambrose to you, whereby he claims we made a 'United Parental Demand.'

"You'll notice Chris Ambrose did not copy me in his email to you. He made a false representation in this email.

"Chris has made false representations in the past.

"He forged my signature on federal tax returns to conceal his earnings and deny me financial access to marital funds. He hacked my email account and sent an email in my name, falsely stating that I would settle a lawsuit, and took the money. He forged my initials on a real estate sales document.

"His email to you, where he claims it came from both of us, is a classic case of him blame-shifting. Your articles have not caused our children to be clinically depressed, ridden by anxiety, engage in self-harm, or have suicidal ideations. On the contrary, these symptoms arose before you wrote your first article about him in 2021. The symptoms began after they were suddenly and traumatically removed from my care and placed in Chris's sole care and custody in April 2020.

"Remember, he was a Hollywood screenwriter who destroyed his career when outed for plagiarism and intellectual property theft. He is used to writing convincing and believable fiction.

"His rebound business warrants investigation: His Eyes Above Productions D-U-N-S number shows it is a barber/beauty industry business. He does not have a barber's license.

"He tells people that Eyes Above Productions is a writing and entertainment company. I am curious to know what kind of entertainment he seeks or provides for others.

"The children exposed on their social media accounts that Chris poses as a barber online to solicit young men.

"I believe your articles are accurate and supported with evidence. Much of the evidence presented in my own case, I only learned through your investigations. It is essential for the public to be warned about the realities of weaponized custody evaluations.

"I agree that you might consider changing the names of the children. But the children are not complaining about Frank Report. Chris is lying about that. For three long years, our children have made it clear that their abuse and trauma has been caused by Chris Ambrose.

"Sincerely,

"Karen Riordan"

Stay tuned for more on this case.... A lot more.


Frank Parlato

# EXHIBIT "D"

**FR** Frank Report

# Police Threaten Teens With 'Rape and Beatings Daily' at Pleasantville Cottage School If They Don't Go Back to Ambrose

⏱ September 19, 2023





### About the Author

Frank Parlato is an investigative journalist.

His work has been cited in hundreds of news outlets, like The New York Times, The Daily Mail, VICE News, CBS News, Fox News, New York Post, New York Daily News, Oxygen, Rolling Stone, People Magazine, The Sun, The Times of London, CBS Inside Edition, among many others in all five continents.

His work to expose and take down NXIVM is featured in books like "Captive" by Catherine Oxenberg, "Scarred" by Sarah Edmonson, "The Program" by Toni Natalie, and "NXIVM. La Secta Que Sedujo al Poder en México" by Juan Alberto Vasquez.

Parlato has been prominently featured on HBO's docuseries "The Vow" and was the lead investigator and coordinating producer for Investigation Discovery's "The Lost Women of NXIVM." Parlato was also credited in the Starz docuseries "Seduced" for saving 'slave' women from being branded and escaping the sex-slave cult known as DOS.

Additionally, Parlato's coverage of the group OneTaste, starting in 2018, helped spark an FBI investigation, which led to indictments of two of its leaders in 2023.

Parlato appeared on the Nancy Grace Show, Beyond the Headlines with Gretchen Carlson, Dr. Oz, American Greed, Dateline NBC, and NBC Nightly News with Lester Holt, where Parlato conducted the first-ever interview with Keith Raniere after his arrest. This was ironic, as many credit Parlato as one of the primary architects of his arrest and the cratering of the cult he founded.

Parlato is a consulting producer and appears in TNT's The Heiress and the Sex Cult, which premiered on May 22, 2022. Most recently, he consulted and appeared on Tubi's "Branded and Brainwashed: Inside NXIVM," which aired January, 2023.

IMDb — Frank Parlato

Contact Frank with tips or for help. Phone / Text: (305) 783-7083 Email: frankparlato@gmail.com

### Archives

Select Month ⌄



Frank Parlato



(f) (X) (e) (in) (✉)

Pleasantville, New York – In a high-stakes standoff, three teenagers—  M.A. M.A and S.A. —resisted their father Chris Ambrose's attempts to bring them back to his Connecticut home tonight forcibly.

The drama unfolded in the tranquil village of Pleasantville, New York, where the teens sought

11:18 pm

refuge with a family friend.



355 Comments



*Chris Ambrose won't let his children live with their mother or allow them to be happy anywhere. He wants them all to himself.*

Local police and CPS workers enlisted by Ambrose arrived at the suburban house, ordering the children to pack their bags and get in the car with their father to go home.

Earlier this year, the teens had fled their father's home in Madison, Connecticut, leveling allegations of physical and sexual abuse.

A Connecticut Family Court ruling on August 8 severed their contact with their mother, leaving them vulnerable and homeless.



M.A., M.A., and S.A.
*have had no respite from their father's relentless pursuit for years – except a short interval when they lived with their mother.*

Initially taking shelter with their maternal grandfather in Rhode Island, the teens were forced to move again following threats from Ambrose. They found temporary sanctuary in Pleasantville, only for their father to track them down and stage a confrontation.

Three Mount Pleasant police officers and Child Protective Services ended their short-lived peace as police and social workers entered the residence, dismissing the teens' claim that attorneys represented them in Connecticut juvenile court in their efforts to emancipate from their father.

The officers issued an ultimatum: "You can't stay here. It doesn't matter, your attorney doesn't matter, you understand?"

Mia responded, "Sure. But I'm not going back. I'll go anywhere else but back to him."

A second officer upped the ante with intimidation tactics. He warned that any alternative placement would expose them to significant dangers, including physical and sexual abuse, and likely separate the siblings due to age.

The officer said:

"... You're going to wind up... with some of the worst kids in the world. And you might not

---

**Authors**

Frank Parlato

Janine Morrison

J.J. O'Hara

Richard Luthmann

Marie White

Paul Serran

- General
- Contact
- Privacy Policy
- Terms & Conditions

be together. You'd be separated because of your age... So the three of you are not going to be staying together. You're going to be in Pleasantville Cottage School, or one of these other places that are a complete shit hole.

And you're gonna get beaten, raped and abused on a daily basis. I promise you that because we take the reports there every day. The kids are, it's horrible, and that's what they do. They're going to place you there until they find out what to do with you. And these are the worst places in the world."

Despite the chilling ultimatum, the standoff extended over hours.

While Ambrose waited outside in his car, the teens recounted their alleged experiences of abuse 



M    said, "He sexually abused me. He emotionally abuses me....He tried to hit me with the car multiple times".

S    said, "He molested me. He touched my penis. I'm not going back with him."

Mi    said, "He's told me that the police are going to pull me out in a stretcher. I'm not going back."

Despite repeated efforts by police and social workers, which alternated with threats and persuasion, the stalemate remained unbroken. Finally, officers retreated, admitting they lacked a court order to remove the teens.

"We'll be back tomorrow morning," an officer warned. "Your father will have a court order to take you."

As the authorities left, Ambrose was seen revving his car before speeding away.

His persistent efforts, described by some as "obsession," leave the fate of his estranged children hanging in the balance.

## Hear the Recording

Hear the actual recording of the Mount Pleasant police officer  threatening teens with rape and beating



### Pleasant



Link to the website for Pleasantville Cottage School, a home for emotionally troubled boys and girls, ages 7-16 (at admission), with educational, behavioral, and emotional challenges.

Mount Pleasant police claim children are raped and beaten daily there.



Frank Parlato

Share this:

🐦 Twitter   👍 Facebook   🔴 Reddit   ✉ Email



the au                                                                          VIEW ALL POSTS

Frank Parlato

Click here to post a comment



**Pilgrim**

September 27, 2023 at 7:15 pm

Are these cops indicted yet? They committed multiple felonies against minors. When is their court date?

REPLY



**Anonymous**

September 29, 2023 at 1:52 am

Chris Ambrose creates these dramas. He has the psychopathic ability to get those in positions of power to abuse his kids and ex wife. This is how the kids have been treated by cops and dcf since 2020! Please continue to follow.

Ambrose has buried the kids with his lies and discredited the mother and the kids with court vendors.

They've made the same complaints for three years – they've bravely told the truth only to be betrayed by those paid to protect them.

Wait until the full story unfolds. The kids realized no one would help so tried to survive and secure evidence for the day they ran to freedom.

The CT courts – Judge Oneill has done everything to keep them away from safety. NY DCF needs to independently investigate. Leave court out if it.

There is plenty of evidence and three teens are not subjecting themselves to this brutality as a joke. They have been abused by their father for years- forced to live with him.

But the treatment of these officers is similar to the treatment of select Madison CT police officers- Mia ran in 2021 and was subjected to similar brutality.

**UNITED STATES DISTRICT COURT**
**District of Connecticut**
**New Haven Division**

---------------------------------------------

CHRISTOPHER A. AMBROSE,

               Plaintiff,

      V.                                          Case No. 22 cv 1648 (VAB) (RAR)

FRANK PARLATO, JR.,

               Defendant.

---------------------------------------------

## <u>CERTIFICATION OF SERVICE</u>

      This is to certify that a copy of the foregoing Defendant Frank Parlato, Jr.'s Notice Pursuant to Local Rule 12(a) containing the full text of FRCP Rule 12 and Local Rule 7, Notice of Motion, Memorandum of Law, and Declaration of Frank Parlato, Jr., has been sent via electronic mail and first-class mail, postage prepaid, this 20th day of November 2023 to:

Christopher A. Ambrose
381 Horsepond Road
Madison, CT 06443
203.505.1889
ca0515@aol.com

                               FRANK PARLATO, JR.
                               29009 Geranium Drive
                               Big Pine Key, Florida 33043
                               Tel:     (305) 783-7083
                               Email:  frankparlato@gmail.com